**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**CRIXENIA MAGPAYO,**

                **Plaintiff,**

        **v.**

**ADVOCATE HEALTH AND
HOSPITALS CORPORATION,**

                **Defendant.**

**Civil Action No. 16-cv-01176**

**Hon. Judge John Robert Blakey**

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO CERTIFY A CLASS
ACTION PURSUANT TO FED. R. CIV. P. 23(b)(3) AND TO AUTHORIZE NOTICE
PURSUANT TO SECTION 216(b) OF THE FLSA**

## TABLE OF CONTENTS

**Page**

FACTUAL BACKGROUND ................................................................................................... 1

I.     ADVOCATE'S TIMEKEEPING POLICIES ................................................................. 1

II.    ADVOCATE'S MEAL BREAK POLICIES .................................................................. 2

III.   JOB TITLES, WORK HOURS, AND JOB ASSIGNMENTS ........................................ 5

LEGAL STANDARD ......................................................................................................... 6

ARGUMENT ..................................................................................................................... 9

I.     PLAINTIFF FAILED TO MEET HER BURDEN WITH RESPECT TO THE
       PURPORTED FLSA AND IMWL COLLECTIVE AND CLASS ACTIONS ............... 9

     A.     The Only Common Policy Is Lawful ................................................................. 9

     B.     There Is No Common Overtime Violation ........................................................ 15

II.    PLAINTIFF'S PROPOSED CLASS DEFINITIONS UNDERSCORE WHY THE
       COURT SHOULD NOT CERTIFY HER CLAIMS ........................................................ 20

III.   PLAINTIFF HAS NOT MET HER BURDEN WITH RESPECT TO THE
       PURPORTED IWPCA CLASS ...................................................................................... 21

     A.     Plaintiff Failed To Identify Any Common Contract Or Agreement ................... 22

     B.     Plaintiff Disavows The Offer Letter As The Requisite Agreement .................... 23

IV.   PLAINTIFF'S FORM OF NOTICE IS IMPROPER ..................................................... 25

CONCLUSION ................................................................................................................. 25

## TABLE OF AUTHORITIES

Page

CASES

*Aguilera v. Waukesha Mem'l Hosp., Inc.*,
   No. 13-C-1245, 2015 WL 3791469 (E.D. Wis. June 18, 2015) ...............................................7

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)...............................................................................20

*Bell v. Bimbo Foods Bakeries Distrib., Inc.*,
   No. 11 C 033043, 2013 WL 6253450 (N.D. Ill. Dec. 3, 2013) ...............................................21

*Bjornson v. Daido Metal USA, Inc.*,
   12 F. Supp. 2d 837 (N.D. Ill. 1998) ...............................................................19

*Boelk v. AT & T Teleholdings, Inc.*,
   No. 12-CV-40, 2013 WL 261265 (W.D. Wis. Jan. 10, 2013) ...............................................8

*Brand v. Comcast Corp.*,
   135 F. Supp. 3d 713, 726 (N.D. Ill. 2015) ...............................................................20

*Bunyan v. Spectrum Brands, Inc.*,
   No. 07 CV 0089, 2008 WL 2959932 (S.D. Ill. July 31, 2008)...............................................8

*Camesi v. Univ. of Pittsburgh Med. Ctr.*,
   No. CIV.A. 09-85J, 2011 WL 6372873 (W.D. Pa. Dec. 20, 2011) ...............................................16

*Camilotes v. Resurrection Health Care Corp.*,
   286 F.R.D. 339 (N.D. Ill. 2012).....................................................7, 9, 10, 12, 21

*Camilotes v. Resurrection Health Care Corp.*,
   No. 10-CV-366, 2012 WL 2905528 (N.D. Ill. July 16, 2012)...............................................22

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013)...............................................................................7

*Creal v. Group O, Inc.*,
   155 F. Supp. 3d 831 (N.D. Ill. 2016) ...............................................................10

*Drake v. Aerotek, Inc.*,
   No. 14-CV-216, 2015 WL 6554592 (W.D. Wis. Oct. 29, 2015)............................................24

*Elder v. Comcast Corp.*,
   No. 12 C 1157, 2015 WL 3475968 (N.D. Ill. June 1, 2015) .................................................7, 8

*Espenscheid v. DirectSat USA, LLC*,
   705 F.3d 770 (7th Cir. 2013) ...........................................................................................12, 18

*Flores v. Lifeway Foods, Inc.*,
   289 F. Supp. 2d 1042 (N.D. Ill. 2003) ..................................................................................9

*Frye v. Baptist Mem'l Hosp.*,
   No. CIV. 07-2708, 2010 WL 3862591 (W.D. Tenn. Sept. 27, 2010), *aff'd sub
   nom.*, 495 F. App'x 669 (6th Cir. 2012) ................................................................................18

*Gaines v. K-Five Constr. Corp.*,
   742 F.3d 256 (7th Cir. 2014) ...............................................................................................16

*Harvill v. Westward Commc'n, L.L.C.*,
   433 F.3d 428 (5th Cir. 2005) ...............................................................................................16

*Infantino v. Martam Constr., Inc.*,
   No. 04 C 5665, 2005 WL 3132362 (N.D. Ill. July 18, 2005) ................................................9

*Hinterberger v. Catholic Health Sys.*,
   299 F.R.D. 22 (W.D.N.Y. 2014)...........................................................................................12

*Hoffman-LaRoche, Inc. v. Sperling*,
   493 U.S. 165 (1989)..............................................................................................................8

*Humphrey v. Int'l Paper*,
   No. 02 C 4147, 2003 WL 22111093 (N.D. Ill. Sept. 11, 2003)............................................20

*Jamie S. v. Milwaukee Pub. Sch.*,
   668 F.3d 481 (7th Cir. 2012) ................................................................................................9

*Jonites v. Exelon Corp.*,
   522 F.3d 721 (7th Cir. 2008) ...............................................................................................15

*Kellar v. Summit Seating, Inc.*,
   664 F.3d 169 (7th Cir. 2011) ...............................................................................................15

*Lipton v. Chattem, Inc.*,
289 F.R.D. 456 (N.D. Ill. 2013)......................................................................20

*Oplchenski v. Parfums Givenchy, Inc.*,
No. 05 CV 6105, 2009 WL 440959 (N.D. Ill. Feb. 19, 2009)................................21

*Oropeza v. Appleillinois, LLC*,
No. 06 C 7097, 2010 WL 3034247 (N.D. Ill. Aug. 3, 2010)....................................9

*Pacheco v. Boar's Head Provisions Co.*,
671 F. Supp. 2d 957, 962 (W.D. Mich. 2009) ........................................................9

*Paz v. Wauconda Healthcare*,
No. 04 C 3341, 2005 WL 1838428 (N.D. Ill. July 29, 2005) ................................25

*Roberts v. Advocate Health Care*,
119 F. Supp. 3d 852 (Aug. 7, 2015)..............................................................19, 20

*Saleen v. Waste Mgmt., Inc.*,
No. CIV 08-4959, 2009 WL 1664451 (D. Minn. June 15, 2009), *aff'd*, 649 F.
Supp. 2d 937 (D. Minn. 2009). ..............................................................................10

*Schneider v. Ecolab, Inc.*,
No. 14 C 01044, 2015 WL 1402615 (N.D. Ill. Mar. 25, 2015) ..............................23

*Schneider v. Ecolab, Inc.*,
No. 14 C 01044, 2016 WL 7840218 (N.D. Ill. Sept. 2, 2016)................................24

*Schremp v. Langlade Cnty.*,
Case No. 11-cv-590, 2012 WL 3113177 (E.D. Wisc. July 31, 2012) ..............16, 19

*Slayton v. Iowa Coll. Acquisition Corp.*,
No. 09-cv-6977, 2010 WL 3937455 (N.D. Ill. Oct. 5, 2010) ................................10

*Strait v. Belcan Eng'g Grp., Inc.*,
911 F. Supp. 2d 709 (N.D. Ill. 2012) ..............................................................10, 25

*Thompson v. Speedway SuperAmerica LLC*
No. 08-CV-1107, 2009 WL 130069 (D. Minn. Jan. 20, 2009)................................10

*Viveros v. VPP Grp., LLC*,
No. 12-CV-129, 2013 WL 3733388 (W.D. Wis. July 15, 2013)................................7

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011).................................................................................................7

*Walker v. Health & Hosp. Corp. of Marion Cty.*,
    No. 115-CV-01978, 2016 WL 7179370 (S.D. Ind. Dec. 9, 2016)...........................7

**STATUTES**

Illinois Wage Payment and Collection Act, 820 ILCS 115 ...........................................21

Despite over a year of extensive discovery, Plaintiff failed to demonstrate, as she must now, that her claims under the Fair Labor Standards Act, the Illinois Minimum Wage Law, and the Illinois Wage Payment and Collection Act are appropriate for class or conditional certification. To the contrary, Plaintiff admits that Advocate's practice of providing meal breaks in its timekeeping system is not unlawful. For that reason alone, her requests for class and conditional certification fail. Additionally, she failed to point to any common practice violating Advocate's lawful policy. Rather, Plaintiff's own witnesses admitted that they were not discouraged from, or disciplined for, taking their meal breaks or entering the "no lunch" code to ensure they got paid for time worked. And, while Plaintiff claims she never took nor was paid for a lunch break, several other nurses swore they regularly take a meal break and on the rare occasion they do not, Advocate pays them for their time worked. Plaintiff's IWPCA claim similarly cannot go forward on a class basis because Plaintiff cannot identify any common contract or agreement in which Advocate promised to compensate ED nurses for unrecorded work during meal breaks. Fatally, Plaintiff specifically disavowed the offer letter she now claims is the common contract. Moreover, the offer letter on which she now bases her claim was not uniformly used, varied significantly in substance and form, and did not even cover the wages at issue in this lawsuit.

## **FACTUAL BACKGROUND**

### I.      **Advocate's Timekeeping Policies.**

Advocate Health and Hospitals Corporation operates Advocate Trinity Hospital, which has an Emergency Room Department ("ED"). (Ex. G/Deposition of Kristin Landini ("Landini Dep.") 30:23-31:7.) Advocate requires nurses working in the ED to record their time using an electronic timekeeping system called AdvocateWorks. (Ex. I/Deposition of Crixenia Magpayo ("Magpayo Dep.") 104:14-21, 121:8-10.)

Nurses' timekeeping practices vary widely. By way of example, some nurses regularly reviewed their time cards for inaccuracies (Ex. Z/Declaration of Meghan Miskell ("Miskell Decl.") ¶ 10; Ex. R/Declaration of Tracee Abren ("Abren Decl.") ¶ 14; Ex. V/Declaration of Caiphia Grant ("Grant Decl.") ¶ 10), others did so periodically (Ex. D/Deposition of Gina DeFilippo ("DeFilippo Dep.") 96:23-97:4), some reviewed them only for part of their employment (Ex. J/Deposition of Michelle Spikes ("Spikes Dep.") 119:21-120:2; Ex. H/Deposition of Christina Lattner ("Lattner Dep.") 53:8-14), and others never reviewed their time (Ex. I/Magpayo Dep. 110:21-23; Ex. A/Deposition of Aona Anderson ("Anderson Dep.") 92:18-20; Ex. B/Deposition of Denise Batie-Howard ("Batie Dep.") 120:1-4; Ex. E/Deposition of Ameca Grass ("Grass Dep.") 73:3-4,114:5-7). Several nurses rejected their time cards due to inaccuracies at some point during their employment (Ex. H/Lattner Dep. 78:20-24; Ex. J/Spikes Dep. 124:24-125:7; Ex. R/Abren Decl. ¶ 14; Ex. Z/Miskell Decl. ¶ 10), while others never declined their time cards (Ex. I/Magpayo Dep. 111:4-6; Ex. D/DeFilippo Dep. 101:23-24; Ex. F/Deposition of Karim Karim ("Karim Dep.") 91:15-17).

## II.    Advocate's Meal Break Policies.

To encourage employees to take their meal breaks, Advocate accounts for a 30-minute meal period during each shift. (Ex. G/Landini Dep. 92:12-93:1; Ex. I/Magpayo Dep. 151:21-152:4.) Managers in the ED also encourage nurses to take their meal breaks. (Ex. AA/Declaration of Raphael Parayao ("Parayao Decl.") ¶¶ 6, 10; Ex. R/Abren Decl. ¶ 8; Ex. S/Declaration of Elisabeth Field ("Field Decl.") ¶ 8; Ex. V/Grant Decl. ¶ 8.) Managers institute varying mechanisms to ensure nurses are able to take meal breaks. For example, some nurses used a "buddy system" in which each nurse would cover another nurse's patients during lunch breaks. (Ex. J/Spikes Dep. 97:17-21; Ex. JJ/Declaration of Christina Lattner ("Lattner Decl.") ¶ 7; Ex. AA/Parayao Decl. ¶ 13.) Some nurses had "float" nurses available to provide coverage.

(Ex. A/Anderson Dep. 87:19-88:2; Ex. B/Batie Dep. 133:24-134:4; Ex. D/DeFilippo Dep. 128:20-129:1; 76:16-22; Ex. F/Karim Dep. 109:3-8; Ex. BB/Declaration of Kevin Pustz ("Pustz Decl.") ¶ 9.) At times, managers and charge nurses established schedules for lunch breaks. (Ex. J/Spikes Dep. 78:1-12; Ex. AA/Parayao Decl. ¶¶ 6, 14; Ex. W/Declaration of Chikira Hale ("Hale Decl.") ¶ 13; Ex. S/Field Decl. ¶ 6.) Some managers also covered for nurses so they could take lunch breaks. (Ex. J/Spikes Dep. 47:3-23, 80:16-81:5, 83:3-5; Ex. W/Hale Decl. ¶ 18; Ex. AA/Parayao Decl. ¶ 7; Ex. T/Declaration of Jessica Frith ("Frith Decl.") ¶ 8; Ex. Y/Declaration of Shoaib Master ("Master Decl.") ¶ 5.)

Plaintiff and one opt-in testified that they never took a 30-minute meal break during their entire tenure at Trinity. (Ex. I/Magpayo Dep. 131:13-21; Ex. H/Lattner Dep. 44:6-11.) Other nurses, however, swore they always, or almost always, went to lunch. (Ex. AA/Parayao Decl. ¶ 10; Ex. R/Abren Decl. ¶ 7; Ex. Z/Miskell Decl. ¶ 15; Ex. S/Field Decl. ¶ 6; Ex. T/Frith Decl. ¶ 11; Ex. BB/Pustz Decl. ¶ 8; Ex. V/Grant Decl. ¶ 6.) Even Plaintiff's own witnesses vary widely in how often they report taking lunch. (*See, e.g.,* Ex. J/Spikes Dep. 88:8-24 (40 to 50 percent of the time); Ex. F/Karim Dep. 94:5-10 (two times a month); Ex. E/Grass Dep. 75:4-15 (two times during year-long tenure).)

If nurses do not take their meal breaks or their meal breaks are interrupted, they have several options to ensure they are paid for that time. For example, they can manually override the lunch deduction by entering a "no lunch" code upon clocking out of AdvocateWorks. (Ex. H/Lattner Dep. 48:23-49:4; Ex. A/Anderson Dep. 49:8-10; Ex. C/Deposition of Frank Bradtke ("Bradtke Dep.") 59:12-60:2.) If they forget to enter that code or need to adjust their time for any other reason, they can fill out a timecard/clocking adjustment form and the time will be added to their pay. (Ex. A/Anderson Dep. 109:17-110:2; Ex. J/Spikes Dep. 109:19-111:14.)

They also can request that their managers change their time. (Ex. J/Spikes Dep. 108:8-16; 122:18-124:12; Ex. A/Anderson Dep. 91:23-92:2; Ex. D/DeFilippo Dep. 98:12-22.) Managers encourage nurses to take their lunches, but if that is not possible, they instruct nurses to use the "no lunch" code or, if they forget to enter that code, to request an adjustment to their time. (Ex. V/Grant Decl. ¶ 8; Ex. S/Field Decl. ¶¶ 8-9; Ex. Y/Master Decl. ¶¶ 6, 8.)

Some of Plaintiff's witnesses claim they never used the "no lunch" code (Ex. FF/Declaration of Ameca Grass ("Grass Decl.") ¶ 14; Ex. EE/Declaration of Gina DeFilippo ("DeFilippo Decl.") ¶ 12), other nurses reported using it only during "particularly brutal shifts" (Ex. JJ/Lattner Decl. ¶ 14; Ex. LL/Declaration of Michelle Spikes ("Spikes Decl.") ¶ 17), and others say they used it from time to time, but not "on each occasion [they] w[ere] not able to take a thirty-minute uninterrupted break" (Ex. DD/Declaration of Denise Batie ("Batie Decl.") ¶ 15; Ex. II/Declaration of Karim Karim ("Karim Decl.") ¶ 14; Ex. A/Anderson Dep. 90:12-22). At least one of Plaintiff's witnesses says she used it at the beginning of her employment, but then stopped. (Ex. GG/Declaration of Claressa Jones ("Claressa Decl.") ¶ 16.) On the other hand, several other nurses swore they use the "no lunch" code every time they miss their lunch. (Ex. R/Abren Decl. ¶ 10; Ex. S/Field Decl. ¶ 9; Ex. V/Grant Decl. ¶ 7; Ex. T/Frith Decl. ¶ 12; Ex. Z/Miskell Decl. ¶ 15.) In addition, some nurses used Advocate's timecard/clocking adjustment forms to request changes to their time (Ex. J/Spikes Dep. 109:19-23; Ex. A/Anderson Dep. 109:17-110:2), whereas other nurses say they never used those forms (Ex. I/Magpayo Dep. 109:9-11; Ex. B/Batie Dep. 124:7-9; Ex. D/DeFilippo Dep. 78:20-79:1). Likewise, some nurses requested that their managers make adjustments to their time (Ex. A/Anderson Dep. 91:23-92:2; Ex. J/Spikes Dep. 108:8-16; 122:18-124:12; Ex. D/DeFilippo Dep. 98:12-20), while one opt-in never approached his managers with timecard issues (Ex. F/Karim Dep. 91:9-11).

### III.    Job Titles, Work Hours, and Job Assignments.

Some ED nurses are full-time employees and work set hours.  (Ex. H/Lattner Dep.

104:16-19; Ex. F/Karim Dep. 128:6-16; Ex. J/Spikes Dep. 58:23-59:8, 61:4-5; Ex. D/DeFilippo

Dep. 45:23-4:8; Ex. I/Magpayo Dep. 70:10-17, 72:12-14.)  Other nurses work part-time as

registry nurses, which means they set their own schedules based on department needs.  (Ex.

A/Anderson Dep. 101:18-102:3; Ex. I/Magpayo Dep. 62:10-11, 72:15-17; Ex. G/Landini Dep.

60:15-18; Ex. C/Bradtke Dep. 32:8-14.)  Some nurses switch between full-time and registry.

(Ex. B/Batie Dep. 66:8-10; Ex. I/Magpayo Dep. 68:2-5.)

Nurses also work a variety of different shifts and testified that their workloads vary

depending upon the time of day they work.  One nurse testified that "it always seemed as if right

around 10, 11 everybody woke up and came to the ER."  (Ex. J/Spikes Dep. 22:12-20.)  Another

nurse stated that his workload "depended on the day and . . . on the time of day."  (Ex. F/Karim

Dep. 34:16-22.)  Still another nurse said that "[t]he ED was usually busy when [she] arrive[d] at

7pm, but it started to wind down around 11pm."  (Ex. W/Hale Decl. ¶ 15.)

On any given shift, nurses are assigned to work in one of three areas of the ED: (1) triage;

(2) fast track; or (3) the main ER.  (Ex. A/Anderson Dep. 65:5-9.)  More experienced nurses may

work as charge nurse instead.  (Ex. J/Spikes Dep. 30:16-22.)  Nurses' responsibilities vary

depending upon their particular assignments.  For example, triage nurses attend to patients in the

waiting room, which can range from 0 to 100 (Ex. Z/Miskell Decl. ¶ 5; Ex. D/DeFilippo Dep.

51:2-5); fast track nurses are assigned 5 to 10 patients, but those patients typically are low acuity

and require less care (Ex. E/Grass Dep. 36:24-37:4; Ex. Z/Miskell Decl. ¶ 6); and main ER

nurses are assigned between 2 to 7 patients (Ex. F/Karim Dep. 33:11-22; Ex. D/DeFilippo Dep.

60:19-24; Ex. E/Grass Dep. 37:5-10).  By contrast, when a nurse works as charge nurse, she

"cover[s] the entire ED, including triage, fast track, and the main ER" (Ex. Z/Miskell Decl. ¶ 8)

and is not assigned any patients (Ex. I/Magpayo Dep. 50:18-23, 145:3-8).  Charge nurses help ensure nurses are able to take their lunches by, for example, waiting to assign new patients to nurses until they return from their breaks, covering for nurses while they go to lunch, and scheduling meal breaks.  (Ex. AA/Parayao Decl. ¶ 14; Ex. W/Hale Decl. ¶ 18; Ex. B/Batie Dep. 76:13-77:3; Ex. H/Lattner Dep. 42:15-21; Ex. J/Spikes Dep. 40:5-19.)  Charge nurses also monitor the flow of the ED, categorize patient acuity, and assist nurses when the ED is especially busy.  (Ex. B/Batie Dep. 69:14-70:2; Ex. D/DeFilippo Dep. 28:15-22, 29:21-30:5; Ex. H/Lattner Dep. 105:9-20; Ex. J/Spikes Dep. 34:12-22.)  Some nurses serve as preceptors to new hires, which means that they are "responsible for teaching and . . . mentoring" new nurses during orientation.  (Ex. H/Lattner Dep. 21:11-22; Ex. AA/Parayao Decl. ¶ 11; Ex. W/Hale Decl. ¶ 10.)  Among other lessons, preceptors teach nurses how to use the "no lunch" code.  (Ex. AA/Parayao Decl. ¶ 11; Ex. U/Declaration of Daniel Golden ("Golden Decl.") ¶ 14.)

One nurse testified that she did not work in the triage area very often (Ex. D/DeFilippo Dep. 49:22-50:3), while another nurse stated that she worked in triage "[m]ore than . . . 70" percent of the time (Spikes Dep. 24:17-19; 26:7-13).  One nurse worked in fast track only "occasionally" (Ex. H/Lattner Dep. 18:19-20), but a different nurse testified that she worked in fast track "a lot" (Ex. D/DeFilippo Dep. 54:4-6).  Several putative class members never served as charge nurses (Ex. A/Anderson Dep. 56:8-10; Ex. D/DeFilippo Dep. 34:17-21; Ex. E/Grass Dep. 62:16-18), while others were in charge anywhere from once a week (Ex. Z/Miskell Decl. ¶ 8), to the majority of their shifts (Ex. H/Lattner Dep. 23:5-13; Ex. J/Spikes Dep. 32:20-33:2), to every shift they worked (Ex. B/Batie Dep. 69:9-13).

## LEGAL STANDARD

A party seeking to certify a class action must first show that the putative class satisfies the four prerequisites of Federal Rule of Civil Procedure 23(a): numerosity, commonality,

typicality, and adequacy of representation. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 344 (2011); *see, e.g., Aguilera v. Waukesha Mem'l Hosp., Inc.*, No. 13-C-1245, 2015 WL 3791469, at *6 (E.D. Wis. June 18, 2015) (class certification denied where claims lacked commonality because some employees had option of leaving communication devices at hospital or handing them off during lunch while others took pagers with them). To grant class certification, "the Court must be satisfied, after a rigorous analysis, that Rule 23's requirements are met." *Elder v. Comcast Corp.*, No. 12 C 1157, 2015 WL 3475968, at *4, 9 (N.D. Ill. June 1, 2015) (declining to certify IMWL and IWPCA claims where technicians reported differences in frequency, nature, and duration of lunch break interruptions, such that "the individualized determinations the court must make undermine the commonality requirement of Rule 23(a)") (internal citation omitted); *see, e.g., Walker v. Health & Hosp. Corp. of Marion Cty.*, No. 115-CV-01978, 2016 WL 7179370, at *12 (S.D. Ind. Dec. 9, 2016) (denying motion to certify dissimilar and atypical claims where employer consistently adjusted employees' time upon request to account for missed meal breaks, hospital's policy provided compensation for missed meal breaks, and non-payment for missed meal breaks was not typical of putative class).

If a plaintiff meets the requirements of Rule 23(a), she still must satisfy at least one of the three subsections of Rule 23(b). *See Viveros v. VPP Grp., LLC*, No. 12-CV-129, 2013 WL 3733388, at *3, 7-9 (W.D. Wis. July 15, 2013) (denying class certification where differences existed among potential class members' claims, including that one plaintiff's meal breaks sometimes lasted almost 90 minutes, while other employees never took a full 30-minute break). Here, Plaintiff invokes only Rule 23(b)(3) (Motion at 21-23), which requires the Court "to take a 'close look' at whether common questions predominate over individual ones." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013); *see, e.g., Camilotes v. Resurrection Health Care Corp.*,

286 F.R.D. 339, 355 (N.D. Ill. 2012) (denying class certification of IMWL claims, finding that common issues did not predominate where "individualized inquiries into the facts surrounding each Plaintiff's meal period experiences will be required") (internal citation omitted). Plaintiff has the burden to prove that class certification is appropriate. *See Elder*, 2015 WL 3475968, at *4.

Courts may conditionally certify a class for notice purposes under Section 216(b) of the Fair Labor Standards Act only "in appropriate cases" where the "judicial system [would] benefit[] by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged . . . activity." *Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 169-70 (1989). Due to her own delay, Plaintiff now concedes that her motion for conditional certification is subject to a heightened level of scrutiny because "the Parties have completed a significant amount of discovery." (Motion at 25.) Plaintiff is correct. *See, e.g., Boelk v. AT & T Teleholdings, Inc.*, No. 12-CV-40, 2013 WL 261265, at *14 (W.D. Wis. Jan. 10, 2013) (denying certification after applying "more scrutiny to plaintiffs' claim than would normally be applied at the conditional certification stage" because parties had "conducted significant discovery"); *Bunyan v. Spectrum Brands, Inc.*, No. 07 CV 0089, 2008 WL 2959932, at *3-4 (S.D. Ill. July 31, 2008) (applying heightened scrutiny and denying conditional certification after fifteen months of discovery had been conducted).

This heightened standard is especially appropriate here because Plaintiff already notified putative class members of her claims. Despite obtaining addresses and telephone numbers for 132 current and former ED nurses, and active work by Plaintiff and her counsel, only ***eight*** nurses opted in to the instant lawsuit and, as described in detail below, their claims vary substantially. And, at least two nurses who signed declarations then refused to participate in the

collective action – Ameca Grass stated in her deposition that she does not want to be part of the lawsuit (Ex. E/Grass Dep. 103:1-2) and Aretha Harris refused to sit for a deposition (Ex. OO/Email from Douglas M. Werman, dated Dec. 14, 2016).  *See, e.g., Oropeza v. Appleillinois, LLC*, No. 06 C 7097, 2010 WL 3034247, at *6-7 (N.D. Ill. Aug. 3, 2010) (dismissing opt-in plaintiffs who refused to be deposed).

## ARGUMENT

### I.    Plaintiff Failed to Meet Her Burden With Respect To The Purported FLSA And IMWL Collective And Class Actions.

Plaintiff may proceed on a class basis only if she can show that the purported class "share some question of law or fact that can be answered *all at once* and that the *single answer* to that question will resolve a central issue in all class members' claims."  *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 497 (7th Cir. 2012).  Courts considering whether to conditionally certify a collective action require a plaintiff to demonstrate she is "similarly situated" to members of the proposed class.  *See Infantino v. Martam Constr., Inc.*, No. 04 C 5665, 2005 WL 3132362, at *1 (N.D. Ill. July 18, 2005).  Central to this inquiry is whether plaintiff and the purported class were subject to a common policy or plan that violated the law.  *See Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042, 1045 (N.D. Ill. 2003).

### A.    The Only Common Policy Is Lawful.

Plaintiff identifies only one policy applicable to all ED nurses – "automatically deduct[ing] a thirty (30) minute meal break for each shift worked" – and rightfully admits that policy is lawful.  (Motion at 12.)  *See, e.g., Camilotes*, 286 F.R.D. at 350 ("an automatic deduction policy, in and of itself, does not violate the FLSA").  Where an employer's policy is lawful, the only way a plaintiff can salvage her motion for certification is to prove that "it was the common and uniform practice . . . not to follow the written policy."  *Pacheco v. Boar's Head*

*Provisions Co.*, 671 F. Supp. 2d 957, 962 (W.D. Mich. 2009); *see, e.g., Slayton v. Iowa Coll. Acquisition Corp.*, No. 09-cv-6977, 2010 WL 3937455, at *2-3 (N.D. Ill. Oct. 5, 2010) (no certification where plaintiff's claim that he was directed not to record pre-shift time was contradicted by class members with different recording practices). In other words, Plaintiff must demonstrate that "enforcement of the automatic-deduction policy created a policy-to-violate-the-policy." *Camilotes*, 286 F.R.D. at 351 (internal citation omitted); *see, e.g., Strait v. Belcan Eng'g Grp., Inc.*, 911 F. Supp. 2d 709, 728-29 (N.D. Ill. 2012) (denying conditional certification, noting that "when alleged violations stem from the enforcement decisions of individual supervisors, without a company-wide policy or plan directing those enforcement decisions, collective treatment is not appropriate") (internal citation omitted); *Saleen v. Waste Mgmt., Inc.*, No. CIV 08-4959, 2009 WL 1664451, at *5 (D. Minn. June 15, 2009), *aff'd*, 649 F. Supp. 2d 937 (D. Minn. 2009) (no conditional certification where plaintiffs had no evidence of any corporate decision not to follow its formal policy of paying for work during meal breaks).

In *Creal v. Group O, Inc.*, the court decertified plaintiffs' FLSA claims, finding that plaintiffs "failed to demonstrate that any non-enforcement of [the employer's] meal policy was 'uniform' or 'system-wide' where several opt-in plaintiffs admitted that they worked through their meal periods of their own accord, noting that "inconsistent enforcement falls far short" of the certification standard. 155 F. Supp. 3d 831, 841 (N.D. Ill. 2016). Similarly, the court in *Thompson v. Speedway SuperAmerica LLC* denied certification, explaining that plaintiffs "failed to establish a colorable basis that . . . a policy-to-violate-the-policy exists" where they were unable to "submit evidence that the reason why the employees were not compensated for these tasks is not because of human error or a rogue store manager, but because of a corporate decision to ignore [defendant's] published policies." No. 08-CV-1107, 2009 WL 130069, at *2 (D. Minn.

Jan. 20, 2009).

In her Motion, Plaintiff claims there was an "unofficial practice" in which management required nurses to work through their meal breaks and discouraged them from using the "no lunch" code. (Motion at 16, 18.) In her deposition, however, Plaintiff admitted no manager ever told her not to take 30 minutes for lunch or to leave lunch early (Ex. I/Magpayo Dep. 143:19-22, 146:22-24), as did several of her witnesses (Ex. E/Grass Dep. 80:17-19; Ex. H/Lattner Dep. 62:12-63:6; Ex. D/DeFilippo Dep. 116:3-20, 135:2-4; Ex. J/Spikes Dep. 103:20-104:5, 105:5-9, 146:6-14). In particular, Aona Anderson admitted that she was never prohibited from taking a lunch break and that she was never discouraged from, threatened with discipline for, or actually disciplined for, taking a lunch. (Ex. A/Anderson Dep. 77:20-23, 94:15-95:4, 121:10-11.) Even more, several nurses explained that managers worked hard to ensure nurses take their lunches, including implementing a "buddy system" to provide coverage for meal breaks (Ex. J/Spikes Dep. 97:17-21; Ex. JJ/Lattner Decl. ¶ 7), bringing float nurses into the ED to provide assistance (Ex. A/Anderson Dep. 87:19-88:2; Ex. B/Batie Dep. 133:24-134:4; Ex. D/DeFilippo Dep. 128:20-129:1; Ex. F/Karim Dep. 109:3-8), and ensuring that charge nurses establish a schedule for lunch breaks (Ex. J/Spikes Dep. 78:1-12; Ex. AA/Parayao Decl. ¶¶ 6, 14; Ex. W/Hale Decl. ¶ 13; Ex. U/Golden Decl. ¶ 6). Putative class members also testified that managers would cover for nurses so that they could take their lunch breaks. (Ex. J/Spikes Dep. 47:3-23, 80:16-81:5, 83:3-5; Ex. W/Hale Decl. ¶ 18; Ex. AA/Parayao Decl. ¶ 7; Ex. T/Frith Decl. ¶ 8; Ex. Y/Master Decl. ¶ 5.) And, when nurses took their breaks, Advocate helped to ensure those breaks were uninterrupted. By way of example, nurses testified that neither calls on their hospital-issued phone, nor overhead pages interrupted their lunch breaks. (Ex. AA/Parayao Decl. ¶ 18; Ex. Z/Miskell Decl. ¶ 14; Ex. R/Abren Decl. ¶ 9.) If nurses received calls on their phones, they

could tell the caller that they were at lunch, or transfer the call to the charge nurse, and end the call. (Ex. BB/Pustz Decl. ¶ 11; Ex. Y/Master Decl. ¶ 11.) Some nurses reported that they also could turn off their hospital-issued phones or leave them at the nurses' station during their lunch breaks. (Ex. T/Frith Decl. ¶ 14; Ex. Y/Master Decl. ¶ 10.) *See, e.g., Hinterberger v. Catholic Health Sys.*, 299 F.R.D. 22, 41 (W.D.N.Y. 2014) (denying class certification where employer "had procedures in place . . . to ensure employees receive a full break whenever possible, and payment for the time worked when they do not"); *Camilotes*, 286 F.R.D. at 348-50 (collective action not appropriate where hospital used "varying mechanisms to relieve nurses from duty so that they can take their meal breaks").

To be sure, some of Plaintiff's witnesses explained that managers instructed them to take meal breaks, but they continued working of their own accord, often because they just did not want to leave their patients to other nurses. (Ex. J/Spikes Dep. 146:19-147:12; Ex. II/Karim Decl. ¶ 7; Ex. JJ/Lattner Decl. ¶ 7; Ex. FF/Grass Decl. ¶ 9; Ex. LL/Spikes Decl. ¶ 8; Ex. CC/Declaration of Aona Anderson ("Anderson Decl.") ¶ 11; Ex. EE/DeFilippo Decl. ¶ 6; Ex. DD/Batie Decl. ¶ 13; Ex. HH/Declaration of Crystal (Oropallo) Jones ("Crystal Decl.") ¶ 11; Ex. GG/Claressa Decl. ¶9; Ex. MM/Declaration of Nichele Thomas ("Thomas Decl.") ¶ 7; Ex. KK/Declaration of Tamara Sahara ("Sahara Decl.") ¶¶ 14-15.) Even if true, this would not result in any violation. *See, e.g., Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 774 (7th Cir. 2013) (when an employee's underreporting is "benign," she has no claim under the FLSA). Moreover, former ED nurse and current nurse educator Chikira Hale explained that when she instructs nurses to take their lunch breaks and they respond that they are "not hungry" or "not ready" to take their breaks, she continues to push them to take their lunches, reminding them that "[w]e all need that mental break." (Ex. W/Hale Decl. ¶ 14; *see also* Ex. AA/Parayao Decl. ¶ 6

(nurses allow others to take lunch in their place if they are not hungry).)

Plaintiff confusingly alleges that Advocate "buried" information on how to use the "no lunch" code and that the code was not "apparent on the computer screen during clock out" (Motion at 7), but her declarants conceded just the opposite. For instance, opt-in Michelle Spikes admitted that "when the Hospital implemented the computerized method of clocking in and out, [she] observed the NL code on [her] own on the computer." (Ex. LL/Spikes Decl. ¶ 16.) Opt-in Claressa Jones admitted that she "saw [the 'no lunch' code] identified in the time keeping system." (Ex. GG/Claressa Decl. ¶ 16; *see also* Ex. B/Batie Dep. 84:6-13 ("no lunch" code was listed amongst the other special codes that nurses use).) Plaintiff also claims nurses were not told how to use the "no lunch" code (Motion at 7-8), but many of Plaintiff's declarants admitted they learned from management or a fellow nurse. (*See, e.g.*, Ex. DD/Batie Decl. ¶ 11; Ex. GG/Claressa Decl. ¶ 18; Ex. II/Karim Decl. ¶ 13; Ex. FF/Grass Decl. ¶ 13; Ex. CC/Anderson Decl. ¶ 15; Ex. MM/Thomas Decl. ¶ 17; Ex. HH/Crystal Decl. ¶ 15.) Furthermore, Advocate's Meal Period policy expressly provides that "[i]f extenuating circumstances prevent an associate from taking a meal period, or if the meal period is interrupted for work reasons . . . [t]he associate will select the 'no lunch' code upon clocking out in the time and attendance system." (Ex. O/Magpayo Dep. Ex. 14; Ex. I/Magpayo Dep. 147:9-19.)

Plaintiff also admits no one ever told her *not* to use the "no lunch" code. (Ex. I/Magpayo Dep. 154:1-3.) Although Plaintiff's admission is dispositive, there is more. Plaintiff's witnesses admitted that management never discouraged them from using the "no lunch" code (Ex. A/Anderson Dep. 94:5-7; Ex. E/Grass Dep. 131:15-19; Ex. J/Spikes Dep. 134:14-16) and that they were never threatened with discipline, nor actually disciplined, for using the code (Ex. A/Anderson Dep. 94:8-14; Ex. B/Batie Dep. 142:16-21; Ex. J/Spikes Dep. 105:11-13). Quite the

opposite, Plaintiff's witnesses admit managers explicitly instructed them to use the "no lunch" code when they were unable to take a lunch. (*See, e.g.,* Ex. GG/Claressa Decl. ¶ 18 ("the Emergency Department was severely understaffed and Jacqueline Whitten told me to go ahead and punch 'no lunch'"); Ex. DD/Batie Decl. ¶ 11 ("manager Patricia (Rayburn) Parker advised me that I could enter the code 'NL' into the time clock indicating I was unable to take a lunch").) Other declarants confirmed this was true. (Ex. S/Field Decl. ¶ 8; Ex. T/Frith Decl. ¶ 12; Ex. V/Grant Decl. ¶ 8; *see also* Ex. U/Golden Decl. ¶ 12 ("On the rare occasion that nurses are unable to take their lunches, I specifically tell nurses to use the 'no lunch' punch."); Ex. Y/Master Decl. ¶ 6 ("If no one is available to cover the nurses or they are unable to take their lunch break for other reasons, I instruct them to enter the 'no lunch' punch at the end of their shifts."); Ex. AA/Parayao Decl. ¶ 9 ("In those rare occasions that a nurse is not able to take a lunch . . . I have instructed nurses to use the 'no lunch' punch.").) And, the data show nurses heeded their managers' instructions. Indeed, of the 130 nurses who worked in the ED between January 26, 2013 and April 16, 2016, approximately 39% used the "no lunch" code during their tenures. (Ex. X/Declaration of Kristin Landini ("Landini Decl.") ¶ 4.)

At best, testimony from Plaintiff's declarants shows only that Advocate encouraged nurses to take their 30-minute meal breaks, *instead of* using the "no lunch" code. For example, opt-in Karim Karim testified as follows:

> Q. So you said that you were informed that you could take it, but they don't want you to. I am asking who the "they" is.
>
> A. Okay. So what I meant was that management didn't want us to use the "no lunch" code. Rather management wanted us to take our full uninterrupted 30-minute break.

(Ex. F/Karim Dep. 111:2-8.) Tamara Sahara similarly testified that her manager and Interim Director of the ED, Jackie Whitten, encouraged her and the other nurses "to find coverage" and

"to be team players and help each other out" so that they could take their meal breaks. (Ex.

KK/Sahara Decl. ¶ 12; *see also* Ex. C/Bradtke Dep. 59:12-60:23 (management discussed with

nurses the importance of taking a break and getting off the unit).)

### B. There Is No Common Overtime Violation.

To prevail on a claim for unpaid overtime wages under the FLSA and the IMWL,

Plaintiff must prove that (1) Plaintiff and nurses were working overtime through missed meal

breaks; (2) Advocate knew or should have known that Plaintiff and nurses in the purported class

were working overtime; and (3) Advocate knew or should have known they were not recording

the overtime hours that they worked. *See, e.g., Kellar v. Summit Seating, Inc.*, 664 F.3d 169,

176-77 (7th Cir. 2011) (judgment for employer where defendant "had little reason to know, or

even suspect, [plaintiff] was acting in direct contradiction of a company policy and practice"

given that she "never told [defendant] that she was working overtime"). As such, to certify her

claims, Plaintiff must show that she can prove liability using evidence common to the purported

class that nurses were working overtime without pay and that Advocate knew about that alleged

unpaid overtime work. *See, e.g., Jonites v. Exelon Corp.*, 522 F.3d 721 (7th Cir. 2008) (finding

"preposterous" plaintiffs' argument that "because some Com Ed employees may sometimes do

some work at lunch, all Com Ed employees are entitled to pay during their lunch break.")

Plaintiff offers no proof, much less common proof, that Advocate had actual or

constructive knowledge that nurses were working during their meal periods without pay. To the

contrary, many of them never, at any point, told their managers or anyone from human resources

that they were not getting paid for work performed during their meal breaks. (Ex. I/Magpayo

Dep. 92:10-12, 151:17-20, 224:20-23; Ex. A/Anderson Dep. 52:11-19, 92:15-17; Ex. E/Grass

Dep. 59:12-60:20, 74:15-18; Ex. J/Spikes Dep. 97:22-24; Ex. B/Batie Dep. 111:3-4; 126:22-

127:7; Ex. F/Karim Dep. 66:9-14, 66:24-68:24; Ex. D/DeFilippo Dep. 77:9-78:19.) *See, e.g.,*

*Gaines v. K-Five Constr. Corp.*, 742 F.3d 256, 270-71 (7th Cir. 2014) (judgment for employer where plaintiff "offers no evidence that . . . he told anyone that he was working unauthorized overtime," noting that an employer "has no obligation to pay for work it did not know about and had no reason to know about"); *Harvill v. Westward Commc'n, L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005) ("if the employee fails to notify the employer . . . of the overtime work, the employer's failure to pay for the overtime hours is not a violation of [the FLSA]") (internal citation omitted).

And with respect to the "no lunch" code, there is substantial variation. While some nurses say they never used the "no lunch" code (Ex. FF/Grass Decl. ¶ 14; Ex. EE/DeFilippo Decl. ¶ 12), there is no evidence to impute knowledge of a missed meal simply because of no code because several nurses testified that they always, or almost always, took their meal breaks (Ex. AA/Parayao Decl. ¶ 10; Ex. R/Abren Decl. ¶ 7; Ex. Z/Miskell Decl. ¶ 15; Ex. S/Field Decl. ¶ 6; Ex. T/Frith Decl. ¶ 11; Ex. BB/Pustz Decl. ¶ 8; Ex. V/Grant Decl. ¶ 6). Plaintiff's witnesses testified they used the "no lunch" code during "particularly brutal shifts" (Ex. JJ/Lattner Decl. ¶ 14; Ex. LL/Spikes Decl. ¶ 17) or from time to time (Ex. DD/Batie Decl. ¶ 15; Ex. II/Karim Decl. ¶ 14; Ex. A/Anderson Dep. 90:15-17), and at least one nurse used it, but only for a portion of her tenure (Ex. GG/Claressa Decl. ¶ 16). The fact that these nurses sometimes used the "no lunch" code means Advocate had no reason to suspect they were not taking their lunch when they did not use it. *See, e.g., Schremp v. Langlade Cnty.*, Case No. 11-cv-590, 2012 WL 3113177, at *3 (E.D. Wisc. July 31, 2012) (no liability where employer "had no reason to suspect Plaintiff was not accurately reporting his time" where employee admitted he sometimes reported overtime); *Camesi v. Univ. of Pittsburgh Med. Ctr.*, No. CIV.A. 09-85J, 2011 WL 6372873, at *5 (W.D. Pa. Dec. 20, 2011) (granting motion to decertify, finding that defendants did not "shirk" FLSA

obligations where "Plaintiffs themselves admit to having been trained on and/or were aware of how to cancel meal break deductions, and they did so on many occasions" and opt-ins were not "dissuaded from cancelling, or instructed not to cancel, deductions for meal breaks"). This is especially true because Advocate consistently paid for overtime and did not discipline or discourage nurses from working overtime. (*See, e.g.,* Ex. I/Magpayo Dep. 195:4-8, 195:21-23; Ex. E/Grass Dep. 80:17-19, 89:24-90:3; Ex. H/Lattner Dep. 62:12-63:6, 80:1-11; Ex. J/Spikes Dep. 103:20-104:5, 105:5-13, 126:24-127:2, 146:6-14; Ex. A/Anderson Dep. 77:20-23, 94:15-95:4, 121:10-15.) And several nurses swore they used the "no lunch" code every time they did not take a lunch. (Ex. R/Abren Decl. ¶ 10; Ex. S/Field Decl. ¶ 9; Ex. V/Grant Decl. ¶ 7; Ex. T/Frith Decl. ¶ 12; Ex. Z/Miskell Decl. ¶ 15.)

Determining whether Advocate had any reason to know nurses allegedly were working without pay during meal breaks also would require the Court to analyze each nurse's time card verification practices. By way of example, some nurses regularly reviewed their time cards for inaccuracies (Ex. Z/Miskell Decl. ¶ 10; Ex. R/Abren Decl. ¶ 14; Ex. V/Grant Decl. ¶ 10), some reviewed them periodically (Ex. D/DeFilippo Dep. 96:23-97:4), others did so for part of their employment (Ex. J/Spikes Dep. 119:21-120:2; Ex. H/Lattner Dep. 53:8-14), and still others never reviewed their time (Ex. I/Magpayo Dep. 110:21-23;Ex. B/Batie Dep. 120:1-4; Ex. E/Grass Dep. 73:3-4). Some nurses refused to approve their time cards due to inaccuracies at some point during their tenure (Ex. H/Lattner Dep. 78:20-24; Ex. J/Spikes Dep. 124:24-125:7; Ex. R/Abren Decl. ¶ 14; Ex. Z/Miskell Decl. ¶ 10), while others never declined their time cards (Ex. I/Magpayo Dep. 111:4-6; Ex. D/DeFilippo Dep. 101:23-24; Ex. F/Karim Dep. 91:15-17). A few nurses requested adjustments to their time using Advocate's timecard/clocking adjustment forms (Ex. J/Spikes Dep. 109:19-23; Ex. A/Anderson Dep. 109:17-110:2), other nurses never

used those forms (Ex. I/Magpayo Dep. 109:9-11; Ex. B/Batie Dep. 124:7-9; Ex. D/DeFilippo

Dep. 78:20-79:1), some nurses asked their managers to change their time (Ex. A/Anderson Dep.

91:23-92:2; Ex. J/Spikes Dep. 108:8-16; 122:18-124:12; Ex. D/DeFilippo Dep. 98:12-20),

whereas others never raised time card issues with their managers (Ex. F/Karim Dep. 91:9-11).

Just as varied as putative collective and class members' practices with respect to

recording, verifying, and adjusting their time are Plaintiff's witnesses' reasons for underreporting

the time they now say they worked during meal breaks, none of which could support a finding of

knowledge under the FLSA or the IMWL.  For example, opt-in Michelle Spikes testified that she

did not use the "no lunch" code because she "was pissed [and] . . . just wanted to leave."  (Ex.

J/Spikes Dep. 135:4-9.)  Aona Anderson admitted that she did not use the "no lunch" code every

time she missed a lunch because "it was out of si[ght] out of mind . . . after some days of

working really hard, the first thing you want to think about i[s] going home, it's not trying to find

an extra click here, click there to clock out."  (Ex. A/Anderson Dep. 91:1-12.)  Opt-in Christina

Lattner testified that she only used the "no lunch" code "[o]n exceptionally bad days" and

admitted that she did not use the code "as much as [she] probably should have."  (Ex. H/Lattner

Dep. 49:10-19.)  In *Frye v. Baptist Memorial Hospital*, the court decertified an FLSA action

"[w]here employees sometimes use[d] procedures to report time worked but neglect[ed] to do so

for all time worked[,] . . . sometimes used the exception procedures[, and] . . . admit that they

sometimes voluntarily failed to report time worked during meal breaks."  No. CIV. 07-2708,

2010 WL 3862591, at *8 (W.D. Tenn. Sept. 27, 2010), *aff'd sub nom.*, 495 F. App'x 669 (6th

Cir. 2012).  Under these facts, the court held the employer "had no reason to know of

uncompensated work occurring during meal breaks and no reason to conduct more significant

monitoring or auditing."  *Id.; see also Espenscheid*, 705 F.3d at 774.

Irrespective of the nurses' reasons for not using the "no lunch" code, they admitted that they knew they would not be paid for time worked during their meal breaks if they did not enter the "no lunch" code. By way of example, Aona Anderson testified to her understanding that Advocate would not "take out [her] 30 minutes for lunch" if she did not punch the "no lunch" code, and specifically admitted that she knew she would not get paid for that time if she did not enter the code. (Ex. A/Anderson Dep. 89:13-16, 91:1-3.) Other nurses likewise understood that if they did not enter their time or otherwise clock in, they would not be paid for that time. (Ex. D/DeFilippo Dep. 94:2-8; Ex. F/Karim Dep. 85:19-21; Ex. H/Lattner Dep. 81:19-22; Ex. J/Spikes Dep. 60:17-22.) *See, e.g., Schremp*, 2012 WL 3113177 at *2 ("where an employee elects to under-report his or her work time, the employer is not liable for the failure to pay unreported overtime under the FLSA"); *Bjornson v. Daido Metal USA, Inc.*, 12 F. Supp. 2d 837, 842 (N.D. Ill. 1998) (judgment for employer who had no knowledge to sustain FLSA and IMWL claims where plaintiff failed to record or submit his overtime hours for payment).

Plaintiff refers to a complaint filed with the Illinois Department of Labor as alleged proof that Advocate had knowledge sufficient to sustain her claims under the FLSA and the IMWL. (Motion at 13.) What Plaintiff conveniently fails to mention is that the IDOL complaint was dismissed, expressly because "[t]he investigation by The Illinois Department of Labor . . . determined that [the claimant] was paid properly under the provisions of the law." (Ex. NN/IDOL Notice of Claim Dismissal, dated Dec. 15, 2014.) The IDOL's decision only further demonstrates that certification is inappropriate.

Plaintiff also cites *Roberts v. Advocate Health Care*, 119 F. Supp. 3d 852 (N.D. Ill. 2015) (Motion at 11, 12, 22), but that case works against Plaintiff. In *Roberts*, the court granted summary judgment to defendant on plaintiff's claims for alleged unpaid post-shift meetings and

missed or interrupted lunches, and merely requested that Advocate provide a clearer chart so it could further consider plaintiff's claim for unpaid overtime associated with pager, text, and email communications. *Id.* at 861-64. In so holding, the court dismissed as "speculative" plaintiff's contention that Advocate "should have noticed that [plaintiff] was periodically working through lunch and not recording this as a skipped or interrupted lunch," noting that "[t]he fact that something is theoretically possible is not enough to create a triable issue of fact." *Id.* at 861-62. The court also found significant that plaintiff "never provided actual notice by complaining to [her manager] or any other supervisor about any of the unpaid overtime she now claims that she worked" and plaintiff "does not argue that Advocate would have refused to pay her if she had used one of the available mechanisms to correct her time." *Id.* at 862.[1]

## II.    Plaintiff's Proposed Class Definitions Underscore Why The Court Should Not Certify Her Claims.

To prove a violation under the FLSA or the IMWL, a putative plaintiff must show she worked more than 40 hours in a workweek without overtime pay. *See Brand v. Comcast Corp.*, 135 F. Supp. 3d 713, 726 (N.D. Ill. 2015) (FLSA and IMWL only require employers to provide overtime pay "for hours spent working beyond 40 hours in one week"). Plaintiff tries – but fails – to overcome this obstacle through her class and collective action definitions, which exclude nurses who always worked less than 38.5 hours per week. Even with Plaintiff's purported definitions, however, the Court still would be required to ascertain, on a week-by-week-basis,

---

[1] For the same reasons that Plaintiff fails to meet the commonality, typicality, and adequacy requirements of Rule 23(a), she also fails to meet Rule 23(b)(3)'s "far more demanding" predominance and superiority requirements. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997); *Lipton v. Chattem, Inc.*, 289 F.R.D. 456, 462 (N.D. Ill. 2013). Given the significant variance in the nurses' shifts, job assignments, meal break practices, use of the "no lunch" code, and timekeeping and approval practices, coupled with their admissions that they knew how to record overtime and were paid for all overtime they recorded, Plaintiff cannot show questions of law or fact common to the class predominate over individual questions and that a class action is superior. *See, e.g., Humphrey v. Int'l Paper*, No. 02 C 4147, 2003 WL 22111093, at *22 (N.D. Ill. Sept. 11, 2003) (denying certification where, "given the individual determinations that would have to be made . . . and the individual damage determinations that would be necessary, there would be little in the way of economy to be achieved by using the class action vehicle").

whether each nurse missed one, two, three, or more lunches, which would be especially time-intensive given that the nurses did not maintain records of allegedly missed meal breaks. (Ex. I/Magpayo Dep. 147:1-3; Ex. A/Anderson Dep. 77:5-8; Ex. E/Grass Dep. 78:5-10; Ex. F/Karim Dep. 95:23-96:10.) Even after these countless individualized inquiries, numerous putative class members still would have no overtime claims. For instance, any nurse who recorded 38.5 hours in a given week would only reach 39 working hours if she could prove that she worked during one of her meal breaks that week, and even if a nurse could prove that she missed three lunches in a given week, her working time still would not exceed the 40 hour threshold required to sustain an FLSA or IMWL claim. What is more, it would be highly unlikely for many nurses to even have had the potential to take (much less miss and fail to record) more than three lunches each week, given that nurses typically did not work more than three 12-hour shifts in a week. (Ex. A/Anderson Dep. 30:17-24; Ex. D/DeFilippo Dep. 56:11-13; Ex. E/Grass Dep. 67:21-68:2; Ex. F/Karim Dep. 80:15-1; Ex. H/Lattner Dep. 115:16-18; Ex. J/Spikes Dep. 17:11-14.) Plaintiff worked three shifts or less in 113 of her 137 workweeks. (Ex. X/Landini Decl. ¶ 5.)

## III. Plaintiff Has Not Met Her Burden With Respect To The Purported IWPCA Class.

The IWPCA does not establish a substantive right to overtime pay or any other kind of wage, but rather only entitles an employee to "compensation owed . . . pursuant to an employment contract or agreement between the 2 parties." 820 ILCS 115/2. As such, to certify an IWPCA class, Plaintiff must identify a contract or agreement common to the purported class in which Advocate promised to compensate each class member for the *specific* type of work at issue. *See Oplchenski v. Parfums Givenchy, Inc.*, No. 05 CV 6105, 2009 WL 440959, at *9 (N.D. Ill. Feb. 19, 2009); *Camilotes*, 286 F.R.D. at 355; *Bell v. Bimbo Foods Bakeries Distrib., Inc.*, No. 11 C 033043, 2013 WL 6253450, at *10-11 (N.D. Ill. Dec. 3, 2013).

**A.      Plaintiff Failed To Identify Any Common Contract Or Agreement.**

Plaintiff attempts to prove commonality by pointing to an alleged "form offer letter" that she claims entitled nurses to "a specified hourly rate of pay in exchange for all hours of work they performed in Trinity's ED." (Motion at 2.) But that offer letter cannot constitute a contract or agreement sufficient to certify an IWPCA claim because it does not promise to pay nurses for work during unrecorded meal breaks, nor is there any letter common to the putative class.

Though the offer letters vary, what they have in common is that none mentions meal breaks or compensation for meal breaks or other time that employees do not record. (*See, e.g.,* Ex. M/Lattner Dep. Ex. 2; Ex. H/Lattner Dep. 34:16-35:1; Ex. Q/Spikes Dep. Ex. 2; Ex. J/Spikes Dep. 56:21-57:6.) In fact, Plaintiff's own witnesses admit that their offer letters did not promise pay for unrecorded lunch breaks (Ex. A/Anderson Dep. 134:18-135:3; Ex. F/Karim Dep. 147:15-21), that they knew of no document that said they would be compensated for lunch breaks they did not record (Ex. E/Grass Dep. 97:9-15), and that they were not otherwise told by anyone at Advocate that they would be paid for unrecorded meal breaks (Ex. H/Lattner Dep. 85:5-86:3). *See, e.g., Camilotes v. Resurrection Health Care Corp.*, No. 10-CV-366, 2012 WL 2905528, at *6 (N.D. Ill. July 16, 2012) (judgment for employer where plaintiffs presented no evidence "that Defendants agreed to pay Plaintiffs for 'all time worked,' even if that time was not recorded").

Instead, without any evidentiary support, Plaintiff's witnesses' declarations assert in cookie-cutter fashion that "it was my understanding that I would be paid my hourly rate of pay for all work I performed." (Ex. II/Karim Decl. ¶ 3; Ex. JJ/Lattner Decl. ¶ 3; Ex. FF/Grass Decl. ¶ 3; Ex. LL/Spikes Decl. ¶ 3; Ex. CC/Anderson Decl. ¶ 3; Ex. EE/DeFilippo Decl. ¶ 3; Ex. DD/Batie Decl. ¶ 3; Ex. HH/Crystal Decl. ¶ 4; Ex. GG/Claressa Decl. ¶ 3; Ex. MM/Thomas Decl. ¶ 2; Ex. KK/Sahara Decl. ¶ 3.) Putting aside the credibility of cookie-cutter claims in declarations, an employee's understanding of her employer's alleged obligation is insufficient.

- 22 -

Where the plain language of the purported agreement makes no mention of payment for unrecorded work, there can be no claim under the IWPCA. *See, e.g., Schneider v. Ecolab, Inc.*, No. 14 C 01044, 2015 WL 1402615, at *5 (N.D. Ill. Mar. 25, 2015) (judgment for employer where plaintiff presented only self-serving testimony regarding "what he understood [his employer's] employees told him about the compensation he would receive").

The offer letter that Plaintiff identifies also was not common, in form or in substance, among the members of the putative class. By way of example, opt-in Christina Lattner's offer letter identified her specific job title, start date, and salary, and nothing more (Ex. M/Lattner Dep. Ex. 2), while opt-in Michelle Spike's letter also included details regarding tasks upon which her employment was contingent (e.g., completion of Employment Eligibility Verification form, background checks) and her 7-day orientation schedule (Ex. Q/Spikes Dep. Ex. 2).

Plaintiff does not point to any other alleged common agreement supporting certification of her IWPCA claim, and indeed she cannot. As Plaintiff's witnesses testified, they were subject to vastly different hiring procedures (Ex. II/Karim Decl. ¶ 3; Ex. FF/Grass Decl. ¶ 3; Ex. MM/Thomas Decl. ¶ 2; Ex. KK/Sahara Decl. ¶ 3), hired for distinct positions with disparate hour requirements (Ex. H/Lattner Dep. 104:16-19; Ex. F/Karim Dep. 128:6-16; Ex. J/Spikes Dep. 61:4-5; Ex. D/DeFilippo Dep. 45:23-4:1; Ex. I/Magpayo Dep. 62:10-11, 70:13-17, 72:12-17; Ex. A/Anderson Dep. 101:18-102:3; Ex. B/Batie Dep. 66:8-10), and required to complete vastly different types of orientation (Ex. D/DeFilippo Dep. 63:4-10; Ex. F/Karim Dep. 53:23-54:4, 55:23-56:3; Ex. H/Lattner Dep. 37:21-38:15; Ex. A/Anderson Dep. 41:5-42:12). Putative class members could not possibly be subject to a common agreement under these varying terms of employment.

### B. Plaintiff Disavows The Offer Letter As The Requisite Agreement.

A plaintiff's experience is not typical of the class where she does not "have the same

essential characteristics as the claims of the class at large." *Schneider v. Ecolab, Inc.*, No. 14 C 01044, 2016 WL 7840218, at *7 (N.D. Ill. Sept. 2, 2016) (denying certification where plaintiff "was subject to a set of institutional constraints . . . that did not limit other" purported class members and, as such, he was not a "representative party who will fairly and adequately protect the interests of the class") (internal citation omitted); *see also Drake v. Aerotek, Inc.*, No. 14-CV-216, 2015 WL 6554592, at *10 (W.D. Wis. Oct. 29, 2015) (class not certified where named representative's experiences with respect to overtime varied widely from that of purported class such that he "cannot show that his claim is typical of those of the class members").

Putting aside for the moment that neither Plaintiff nor any of her witnesses were able to identify any contract or agreement in which Advocate promised to compensate them for unrecorded meal breaks, the purported contract underlying Plaintiff's IWPCA claim is an *entirely different document* from the offer letters that Plaintiff's witnesses discuss in their declarations. Plaintiff testified that a Tiered Registry Requirements document – which was unsigned and makes no mention of her specific job title, contingencies of employment, or orientation requirements – was the basis of her IWPCA claim. (Ex. P/Magpayo Dep. Ex. 26; Ex. I/Magpayo Dep. 53:15-54:22, 257:19-258:9.) Plaintiff's witnesses, by contrast, admitted that they did not even recognize the Tiered Registry Requirements document. (Ex. L/Karim Dep. Ex. 7; Ex. F/Karim Dep. 131:1-4; Ex. K/Grass Dep. Ex. 8; Ex. E/Grass Dep. 93:5-11.) Several putative class members also never worked as registry nurses during their tenures in the ED and, as such, would never have received the Tiered Registry Requirements document. (Ex. J/Spikes Dep. 61:4-5; Ex. D/DeFilippo Dep. 45:23-46:1; Ex. H/Lattner Dep. 104:16-19.)

Plaintiff specifically denied that any document other than the Tiered Registry Requirements document underlies her IWPCA claim. (Ex. I/Magpayo Dep. 258:9-19, 259:23-

- 24 -

261:5.)  In fact, Plaintiff expressly refused to characterize the "form offer letter" she now alleges warrants certification as her offer of employment, and instead described it as "the schedule for new associate orientation."  (Ex. N/Magpayo Dep. Ex. 3; Ex. I/Magpayo Dep. 82:19-83:4.) Plaintiff cannot now claim that she is entitled to certification on the basis of a document that she expressly disavowed during her deposition.  *See, e.g., Paz v. Wauconda Healthcare*, No. 04 C 3341, 2005 WL 1838428, at *6 (N.D. Ill. July 29, 2005) (prohibiting plaintiff from "negat[ing] the content of her deposition . . . simply because she made statements that turned out to be damaging to her case").  Plaintiff's testimony relying on a unique document renders her claim not "typical" and makes her an inadequate class representative.  *See, e.g., Strait*, 911 F. Supp. 2d at 733 (plaintiffs were not "paradigmatic" of the class where they were paid differently than purported class members and "worked in only a single department . . . [so] would not represent claims typical to . . . employees at other facilities").

## IV.    Plaintiff's Form Of Notice Is Improper.

Plaintiff prematurely attached a proposed notice even though this Court has not ruled on Plaintiff's Motion.  Although the Court should deny Plaintiff's Motion in its entirety, if granted in whole or in part, the Court should deny some of Plaintiff's proposed language as misleading, and provide the parties the opportunity to meet and confer on alternate language.

## <u>CONCLUSION</u>

Defendant Advocate respectfully requests that the Court deny Plaintiff's Motion to Certify a Class Action Pursuant to Fed. R. Civ. P. 23(b)(3) and to Authorize Notice Pursuant to Section 216(b) of the FLSA.

Dated: June 13, 2017

Respectfully submitted,

s/ Efrat R. Schulman

Michael J. Gray (06210880)
mjgray@jonesday.com
Efrat R. Schulman (06280999)
eschulman@jonesday.com
Samantha Woo (06310522)
swoo@jonesday.com
JONES DAY
77 West Wacker
Chicago, IL 60601.1692
Telephone: +1.312.782.3939
Facsimile: +1.312.782.8585

*Counsel for Defendant Advocate Health and Hospitals Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify I electronically filed a true and correct copy of the foregoing using the

CM/ECF filing system, which will send a notice of electronic filing to the following attorneys for

Plaintiff:

Maureen A. Salas
Douglas M. Werman
Sarah J. Arendt
WERMAN SALAS P.C.
77 W. Washington St., Suite 1402
Chicago, IL 60602

on this 13th day of June, 2017.

s/ Efrat R. Schulman

*One of the Attorneys for Defendant Advocate
Health and Hospitals Corporation*