# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CRIXENIA MAGPAYO, individually and
on behalf of all others similarly situated,

Plaintiff,

v.

ADVOCATE HEALTH AND HOSPITALS
CORPORATION,

Defendant.

Case No. 16-cv-01176

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiff Crixenia Magpayo sued Defendant Advocate Health and Hospitals Corporation under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.*; the Illinois Minimum Wage Law (IMWL), 820 ILCS 105/1, *et seq.*; and the Illinois Wage Payment and Collection Act (IWPCA), 820 ILCS 115/1, *et seq.* Plaintiff alleges that Defendant failed to pay her—and others similarly situated—certain overtime wages and wages earned for working through lunch breaks. Plaintiff moved to certify a class for her state-law claims and conditionally certify an FLSA collective action [68], and Defendant moved for summary judgment [74]. For the reasons explained below, this Court grants Plaintiff's motion and partially grants Defendant's motion.

## I. Background

The following facts come from Defendant's Local Rule 56.1 statement of material facts [77] and Plaintiff's Local Rule 56.1 statement of additional facts [82].[1]

Defendant operates Advocate Trinity Hospital (Trinity). [77] ¶ 2. Plaintiff worked as a nurse in the hospital's emergency room department (ED) from about April 2012 to January 2016. *Id.* ¶ 4. Before Plaintiff accepted her job at Trinity, an ED manager emailed her the "RN Tiered Registry Requirements" schedule. [82] ¶ 2. The schedule specified that Plaintiff would earn $36.75 per hour as a Tier II registry nurse, and also specified the number and type of shifts that Plaintiff would need to work. [77] ¶ 9. After Plaintiff accepted the job, a staffing consultant from Trinity sent her a letter in March 2012 stating: "This letter is to confirm our verbal offer and your acceptance of the RN Registry-Tier II position at an hourly salary of $36.75." [82] ¶ 4. Plaintiff signed the letter and returned it to Defendant on her first day of work in April 2012. [83] ¶ 5.

For most of her time in the ED, Plaintiff worked "registry," which meant that

---

[1] The parties disagree over many of the events leading to this case, and each filed extensive responses to the other's statement of facts. [81, 88]. Some denials (from both sides), however, fail to show a genuine dispute regarding the challenged facts because the evidence cited in the denial actually supports those facts. This Court has broad discretion to enforce the local rules governing summary judgment motions. *See, e.g.*, *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014). As such, simply denying a fact that has evidentiary support "does not transform it into a disputed issue of fact sufficient to survive a motion for summary judgment," and this Court disregards any insufficient denials. *Roberts v. Advocate Health Care*, 119 F. Supp. 3d 852, 854 (N.D. Ill. 2015) (citation omitted); *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). Likewise, "purely argumentative denials," legal conclusions, and unsupported general denials do not belong in Local Rule 56.1 statements, and this Court disregards them as well. *Malec*, 191 F.R.D. at 584; *see also Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000) (applying Rule 56 under its prior designation as Rule 12).

she had a flexible schedule. [77] ¶ 7. Given the flexible nature of Plaintiff's job, her hours per week varied from zero to more than 40. *Id.* ¶ 8. Between January 2013 and December 2015, Plaintiff worked over 40 hours in 22 workweeks and worked between 38.5 and 40 hours in 2 workweeks. [82] ¶ 39. While working in the ED, Plaintiff recorded her hours using AdvocateWorks (AW), Defendant's electronic timekeeping system. [77] ¶ 13.

Defendant's Meal Period policy says that employees get an unpaid 30-minute meal period for each consecutive block of 7.5 hours worked. *Id.* ¶ 28. Accordingly, AW automatically deducts 30-minutes' pay from each shift for which an employee is eligible for a meal period. *Id.* ¶ 29. Defendant's Meal Period policy and Associate Handbook, both of which Plaintiff denies receiving, provide for employees to use a "no lunch" code in AW if they could not take an uninterrupted 30-minute meal break during a shift. *Id.* ¶¶ 31–34. Alternately, employees may notify managers about not getting a 30-minute meal break, or may fill out a timecard adjustment form, which a manager would sign and send to payroll. *Id.* ¶ 31–32, 37.

Before taking a break, ED nurses must find someone to cover their patients. *Id.* ¶ 17. The parties agree that Plaintiff never used a "no lunch" code while working at Trinity, [82] ¶ 40, but she alleges that: (1) she never received an uninterrupted 30-minute meal break because ED nurses were stretched too thin to cover each other's patients; and (2) Defendant never told her that she could use the "no lunch" code or a timecard adjustment form. *Id.* ¶¶ 18–19, 31. Plaintiff also

alleges that Trinity's ED managers knew that she and other nurses did not get meal breaks and that Defendant did not pay them for the missed breaks. *Id.* ¶ 27.

Plaintiff testified that, on some occasions, she continued working on patient charts after clocking out of AW. [77] ¶ 46. Although Plaintiff acknowledged that "no one ever told her to punch out and continue working," *id.* ¶ 45, she contends that she interpreted pressure from management to multitask and clock out on time as an order to clock out at her shift's scheduled end time, but nevertheless to stay late and finish any remaining charting duties "off the clock." [82] ¶ 12. Defendant's electronic charting system allows nurses to edit patient charts while logged out of AW. *Id.* ¶ 13. When Plaintiff stayed logged in to AW while working on charts beyond her scheduled shift end, Defendant paid her for that time. [77] ¶ 48.

## A.    Class and Collective Action Allegations

Plaintiff alleges that she and other current and former registered nurses from Trinity's ED are similarly situated because Defendant failed to pay them for some or all of their work as described above, affecting all proposed class members equally. [45] ¶ 19, 28–29. Specifically, Plaintiff alleges that all nurses worked "under common employment policies," subject to "the same compensation scheme" (an hourly rate of pay for all hours worked), and that Defendant automatically deducted 30-minutes' pay for a meal break from each nurse's daily wages, even though the nurses rarely or never got uninterrupted 30-minute meal breaks. *Id.* ¶ 20. Beyond the automatic deductions, Plaintiff alleges that Defendant knowingly required

uncompensated work from its ED nurses, such as responding to pages immediately even if they were trying to take a meal break. Id. ¶ 21. Defendant allegedly knew that staffing levels for ED nurses were too low for nurses to take uninterrupted meal breaks. *Id.* ¶ 22. Plaintiff estimates that the proposed IMWL and IWPCA classes contain at least 40 people each. *Id.* ¶ 26.

Attached to Plaintiff's class certification motion are declarations from 11 other ED nurses who tell essentially the same story: that Defendant automatically deducted pay for 30-minute meal breaks that the nurses hardly, if ever, got to take because going on break was "neither realistic nor safe" for patients. *See* [69-1] at 12–71. Each nurse swears that Defendant's automatic-deduction policy "caused me to not be paid for all the time that I worked," that they told their managers that they typically did not get lunch breaks, and that Defendant never told them about the "no-lunch" code. *See, e.g.*, *id.* at 43–45. Each declaration also alleges that Defendant hired the nurses at "an hourly rate of pay for all work." *Id.* at 12–71.

## II. Legal Standard

Courts should grant summary judgment when the moving party shows that no genuine dispute exists as to any material fact and the evidence weighs so heavily in the moving party's favor that the moving party "must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also* Fed. R. Civ. P. 56. A genuine dispute as to a material fact exists when, based upon the evidence, a reasonable jury could find for the non-moving party. *Anderson*, 477 U.S. at 248. To

show a genuine dispute as to a material fact, the non-moving party must point to "particular materials in the record," and cannot rely upon the pleadings or speculation. *Olendzki v. Rossi*, 765 F.3d 742, 746 (7th Cir. 2014).

Courts must evaluate evidence in the light most favorable to the non-moving party and must refrain from making credibility determinations or weighing evidence. *Rasho v. Elyea*, 856 F.3d 469, 477 (7th Cir. 2017) (citing *Anderson*, 477 U.S. at 255). The moving party bears the burden of establishing the lack of genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To obtain class certification under Federal Rule of Civil Procedure 23, Plaintiff must satisfy Rule 23(a)'s four requirements—numerosity, commonality, typicality, and adequacy of representation—and one of Rule 23(b)'s subparts. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). Plaintiff seeks to certify a Rule 23(b)(3) class for her state-law claims, so she must show that: (1) questions of law or fact common to the proposed class predominate over questions affecting only individual members; and (2) a class action is superior to other available options for resolving the controversy. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

Although certifying a class is not "a dress rehearsal for the trial on the merits," Plaintiff must demonstrate by a preponderance of the evidence that her proposed class satisfies each of Rule 23's requirements. *Id.* Thus, the "rigorous analysis" involved in certifying a class often overlaps with the merits of the

underlying claim. *Wal-Mart*, 564 U.S. at 351. For the purposes of certifying a class, this Court does not presume the truth of all well-pleaded allegations. Instead, it can look "beneath the surface" of the second amended complaint [45] to conduct the inquiries that Rule 23 requires. *Davis v. Hutchins*, 321 F.3d 641, 649 (7th Cir. 2003); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 677 (7th Cir. 2001). That said, however, this Court may not decline to certify a class simply because it believes the class's claims will fail on the merits. *Messner*, 669 F.3d at 823; *see also Schleicher v. Wendt*, 618 F.3d 679, 687 (7th Cir. 2010). Ultimately, Rule 23 tasks this Court with making "whatever factual and legal inquiries are necessary" to determine if a class should be certified, even if those inquiries involve difficult questions related to the case's merits. *Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010).

Unlike Plaintiff's state-law claims, FLSA suits cannot proceed as class actions. Instead, they proceed as "opt-in representative actions," or collective actions. *Schaefer v. Walker Bros. Enters.*, 829 F.3d 551, 553 (7th Cir. 2016); *see also* 29 U.S.C. § 216. Through the conditional certification process, a district court determines whether potential plaintiffs "should be sent a notice of their eligibility to participate and given the opportunity to opt in to the collective action." *Ervin v. OS Rest. Servs., Inc.*, 632 F.3d 971, 974 (7th Cir. 2011).

Neither Congress nor the Seventh Circuit has specified exactly how courts should decide FLSA certification issues, but courts in this district generally use a

two-step process. *See, e.g., Nicks v. Koch Meat Co., Inc.*, 265 F. Supp. 3d 841, 848 (N.D. Ill. 2017) (internal quotation marks omitted). First, a plaintiff must make a "modest factual showing" that she and "similarly situated employees" were "victims of a common policy" that violated the FLSA. *Grosscup v. KPW Mgmt.*, 261 F. Supp. 3d 867, 870 (N.D. Ill. 2017). Courts interpret "similarly situated" leniently, meaning plaintiffs need only clear a low bar to meet their burden at step one. *Jirak v. Abbott Labs., Inc.*, 566 F. Supp. 2d 845, 848 (N.D. Ill. 2008). During this first stage, courts do not "make merits determinations, weigh evidence, determine credibility, or specifically consider opposing evidence" from the defendant. *Bergman v. Kindred Healthcare, Inc.*, 949 F. Supp. 2d 852, 855–56 (N.D. Ill. 2013) (citation omitted). If a plaintiff clears the "similarly situated" hurdle, a court conditionally certifies the FLSA collective action and authorizes the plaintiff to send notice to potential plaintiffs, who may then opt in. *Grosscup*, 261 F. Supp. 3d at 870.

Second, after the opt-in process finishes and discovery closes, the district court must reevaluate its conditional certification to determine whether the named plaintiff and opt-in plaintiffs share enough similarities to allow the case to go to trial as a collective action. *Nicks*, 265 F. Supp. 3d at 849. The second step imposes more demanding requirements on plaintiffs, *id.*, but is not yet relevant to this case.

A.      **FLSA and IMWL Standards**

The FLSA and the IMWL entitle most employees to overtime pay at one-and-a-half times their regular rate for all hours worked beyond 40 in a workweek. 29

U.S.C. § 207; 820 ILCS 105/4a. Courts apply the same analysis for overtime claims under both statutes. *See Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 672 n.3 (7th Cir. 2010) (collecting cases). Employees bear the burden of proving that they performed overtime work without getting proper compensation. *Kellar v. Summit Seating, Inc.*, 664 F.3d 169, 173 (7th Cir. 2011).

To succeed on an overtime claim, an employee must show that her employer "had actual or constructive knowledge of her overtime work." *Id.* at 177. The FLSA requires an employer to "exercise its control and see that the work is not performed" if the employer does not want the work performed. 29 C.F.R. § 785.13. That duty applies even when the employee fails to officially report overtime hours. *Kellar*, 664 F.3d at 177 (quoting *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 288 (2d Cir. 2008)).

### B. IWPCA Standards

The IWPCA allows employees to seek "the timely and complete payment of earned wages" that their employer owes pursuant to an employment agreement. *Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016) (citing 820 ILCS 115/2–3). In contrast to the FLSA and the IMWL, the IWPCA does not create a substantive right to any particular type of pay (like overtime); it simply "entitles workers to the compensation owed under their employment agreement." *Almy v. Kickert Sch. Bus Line, Inc.*, 722 F.3d 1069, 1075 (7th Cir. 2013) (citing § 115/2). Under the IWPCA, "agreement" means only that both sides mutually assented to

the terms, so parties may enter an agreement "without the formalities and accompanying legal protections of a contract." *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 452 (7th Cir. 2012) (citation omitted). By the same token, employees and employers can also "set the material terms of the agreement," including compensation, "by acting in a manner consistent with an employment agreement." *Landers-Scelfo v. Corp. Office Sys., Inc.*, 827 N.E.2d 1051, 1059 (Ill. App. Ct. 2005).

## III. Analysis

Plaintiff seeks conditional certification of her proposed FLSA class and certification of her proposed Rule 23(b)(3) classes for IMWL and IWPCA claims. Defendant seeks summary judgment on all claims. This Court addresses Defendant's summary judgment motion first.

### A. Summary Judgment

#### 1. FLSA and IMWL Claims

Both the FLSA and the IMWL entitle Plaintiff to overtime pay for hours she worked beyond 40 in a given workweek, provided Defendant had "actual or constructive knowledge" of that overtime work. *Kellar*, 664 F.3d at 177. Reading the evidence in the light most favorable to Plaintiff, *Anderson*, 477 U.S. at 255, this Court partially grants and partially denies Defendant's summary judgment motion.

Defendant first argues that Plaintiff has no valid overtime claims because she admitted in her deposition that Defendant paid her overtime whenever she worked more than 40 hours in a workweek. Not so. Plaintiff acknowledged that

Defendant paid her properly for any *recorded* overtime, not for every overtime hour she worked. [78-1] at 50. Throughout her deposition, Plaintiff reiterated that she was not paid for time she spent on patient charts after punching out of AW. *See, e.g.*, *id.* at 10. Also, because Plaintiff has some linguistic difficulties (not speaking English as her native language), *see id.* at 8, Defendant's overly technical analysis of how she worded her various deposition answers fails to foreclose her claims.

Next, Defendant argues that Plaintiff's overtime claims fail because Defendant's policies made employees responsible for accurately recording their time. Defendants contend that, by choosing not to record missed meal breaks and some overtime hours, Plaintiff gave Defendant "no reason to suspect" that she both worked extra time and did not accurately report that time. [76] at 11. Defendant is correct that employers are not liable on overtime claims if they "neither knew nor should have known" that employees worked overtime. *Kellar*, 664 F.3d at 177. But Defendant "cannot hide behind a policy of having employees keep their own time to avoid compensating the employees for all overtime hours worked, including unrecorded hours." *Skelton v. Am. Intercontinental Univ. Online*, 382 F. Supp. 2d 1068, 1072 (N.D. Ill. 2005). Regardless of internal policies, the ultimate responsibility for ensuring that timesheets accurately reflect employee hours rests with employers, not employees. *See* 29 U.S.C. § 211(c); 820 ILCS 105/8; *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). If Plaintiff can prove at trial that she, in fact, worked uncompensated overtime and that Defendant had actual or

constructive knowledge of that work, *Kellar*, 664 F.3d at 173, 177, then she could prevail despite her inaccurate time sheets.

Defendant cites a variety of cases granting summary judgment to employers on overtime claims, and characterizes those cases as standing for the proposition that an employee who fails to utilize her employer's procedures for recording and correcting hours cannot succeed on a FLSA claim. *See, e.g.*, [76] at 11 (citing *Joiner v. Bd. of Trs. of Flavius J. Witham Mem'l Hosp.*, No. 13-cv-555, 2014 WL 3543481 (S.D. Ind. July 17, 2014)). Those cases, however, do not say what Defendant wants them to say. In *Joiner*, for example, the court granted summary judgment not because the plaintiff employees failed to follow their employer's timekeeping policy, but because they provided *no* evidence that they ever complained to their employer about missed meal breaks. 2014 WL 3543481, at *6. In other words, following the employer's policies could have saved the plaintiffs' FLSA claims by giving their employer notice of overtime, but the plaintiffs also could have given notice in other ways. No blanket rule exists in the Seventh Circuit barring FLSA claims from employees who fail to follow their employers' timekeeping policies. To the contrary, employers "cannot hide behind a policy of having employees keep their own time" to evade FLSA liability. *Skelton*, 382 F. Supp. 2d at 1072.

Since Defendant's policies do not legally bar Plaintiff's claim, this Court examines whether Plaintiff shows a genuine dispute as to whether she performed uncompensated overtime work that Defendant knew about. In her deposition,

Plaintiff testified that she never got an uninterrupted 30-minute meal break and that "at least one to two times a week" she continued charting after logging out of AW. *See, e.g.*, [78-1] at 13, 34, 40. Defendant disputes Plaintiff's version of events, but because Plaintiff opposes the summary judgment motion, this Court views the evidence in the light most favorable to her. *Anderson*, 477 U.S. at 255. Thus, Plaintiff shows, based upon "particular materials in the record," that a genuine dispute exists as to whether she performed uncompensated overtime work. *Olendzki*, 765 F.3d at 746.

As for evidence that Defendant had actual or constructive knowledge of Plaintiff's uncompensated overtime work, Plaintiff testified that she told Assistant Clinical Manager Lisa Brown "most of the time" when she continued working after clocking out. [78-1] at 72. Plaintiff also testified that, during daily morning meetings with the ED nurses on shift, Director Jacqueline Whitten and Manager Patricia Parks learned that nurses could not take 30-minute meal breaks because the ED was short-staffed, and that they told the nurses to "hang in there." *Id.* at 20. Plaintiff further stated that at most of the morning meetings, her managers said they were "trying to get new nurses to cover us." *Id.* at 39. Read in the light most favorable to Plaintiff, this evidence indicates that Plaintiff's supervisors knew that she worked off the clock to finish charting and knew that she did not get lunch breaks. When a supervisory employee acts within the scope of employment, her knowledge is imputed to her employer. *Dana Container, Inc. v. Sec'y of Labor*, 847

F.3d 495, 499 (7th Cir. 2017) (citation omitted). Because Plaintiff's supervisors knew about her extra work, Defendant knew too.

Of course, as Defendant points out, knowing that an employee works overtime is different from knowing that an employee does not get paid for overtime. Defendant argues that Plaintiff fails to show that Defendant knew she did not record her extra time or submit timecard adjustment forms to correct her hours. But Plaintiff testified that managers must approve time cards, [78-1] at 29, and per the undisputed facts, managers must also sign timecard adjustment forms before sending them to payroll, [77] ¶ 31–32, 37. Plaintiff further testified that she felt pressure not to use the "no lunch" code because another nurse said that a manager called her in for a meeting whenever that nurse used the code. *See, e.g.*, [78-1] at 12 ("she was told not to use the no punch lunch for 30-minutes break"). More directly, Plaintiff testified that management pressured her to clock out on time, but still stay late to finish her work. S*ee, e.g.*, *id.* at 33 ("we were under pressure—under pressure that we have to punch out on time—irregardless").

Moreover, the parties do not dispute that Plaintiff never used a "no lunch" code, [82] ¶ 40, and even though managers heard in daily meetings that Plaintiff and other ED nurses did not get lunch breaks, they continued to approve timecards without "no lunch" codes. Plaintiff also testified that she told her manager once or twice a week that she continued working on patient charts after logging out of AW, but her manager still approved Plaintiff's timecards even though Plaintiff did not

14

submit timecard adjustment forms. [78-1] at 29. Again, a supervisor's knowledge is imputed to the employer. *Dana Container*, 847 F.3d at 499. And the FLSA obligates every employer "to keep an accurate record" of each employee's hours. *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 314 (7th Cir. 1986). So, although Plaintiff never reported inaccuracies in her pay stubs to her managers, Defendant had an independent obligation to ensure that its records accurately reflected Plaintiff's work. Interpreting the evidence in the light most favorable to Plaintiff, *Anderson*, 477 U.S. at 255, this evidence shows a genuine dispute as to whether Defendant knew that Plaintiff worked *uncompensated* overtime hours.

Defendant claims that Plaintiff cannot rely on "her own deposition, or self-serving affidavits, to meet her burden of proof" at summary judgment. [76] at 6. But the Seventh Circuit has ruled that plaintiffs *can* "rely on 'self-serving' evidence to create a material factual dispute." *Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013) (overruling a line of cases holding otherwise). Indeed, if Defendant was correct, the moving party at summary judgment could simply fall back on using the "self-serving" label to evade "perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." *Id.* at 967. Here, a reasonable factfinder could rely upon Plaintiff's testimony to conclude that Plaintiff worked uncompensated overtime hours with Defendant's knowledge.

Finally, Defendant argues that it merits summary judgment on Plaintiff's overtime claims for any workweek in which Plaintiff could not have worked more

than 40 hours. In her response to Defendant's motion, Plaintiff concedes that her claims remain limited to 24 particular weeks: "she worked over 40 hours in 22 work weeks and worked between 38.5 and 40 hours in 2 work weeks. *Those are the weeks* in which Plaintiff seeks unpaid overtime wages under the FLSA and IMWL for the additional unpaid hours she worked." [80] at 15 (emphasis added). Based upon the record, no genuine issue of material fact precludes granting Defendant's summary judgment motion as to Plaintiff's FLSA and IMWL claims for any other unidentified workweek. Consequently, this Court partially grants Defendant's summary judgment motion as to FLSA and IMWL claims based upon any workweeks other than the 24 weeks that Plaintiff identified.

### 2.    IWPCA Claim

Under the IWPCA, Plaintiff may recover earned wages from Defendant if Defendant owes those wages pursuant to an employment agreement. *Enger*, 812 F.3d at 568 (citing 820 ILCS 115/2–3). Defendant argues that no employment agreement existed between the parties, while Plaintiff argues that the RN Tiered Registry Requirements schedule and the March 2012 letter from Defendant confirming her "acceptance of the RN Registry-Tier II position at an hourly salary of $36.75" constitute an agreement between the parties. Based upon the record, Plaintiff has the better argument, at least regarding the schedule.

### a)    Documents at Issue

Before determining whether Plaintiff and Defendant had an employment

agreement, this Court must decide whether to consider both of Plaintiff's proffered documents as potential agreements. Defendant argues that Plaintiff cannot rely on the 2012 acceptance letter because she denied that it was a contract during her deposition. This Court agrees.

While testifying, Plaintiff characterized the schedule as "the only contract" she had discussed during her deposition. [78-1] at 66. As for the letter, Plaintiff described it as "the schedule for new associate orientation" and denied—in response to a direct question—that it was her offer for employment. *Id.* at 22. Yet in a declaration that Plaintiff filed after Defendant moved for summary judgment, she described the letter as a "written offer." [83-1] at 20. Plaintiff also referred to the letter as a "written offer" in her response opposing summary judgment. [80] at 4.

This Court earlier expressed an unwillingness to bar Plaintiff's claims based upon technical analyses of her deposition answers, but on this issue she gave clear and unequivocal denials regarding the letter. In the Seventh Circuit, affidavits "offered to contradict the affiant's deposition are so lacking in credibility as to be entitled to zero weight in summary judgment proceedings unless the affiant gives a plausible explanation for the discrepancy." *Beckel v. Wal-Mart Assocs., Inc.*, 301 F.3d 621, 623 (7th Cir. 2002). This same rule applies to sworn declarations. Here, the record provides no plausible explanation for why Plaintiff's declaration completely changed course on the letter, and thus, her eleventh-hour retraction fails to create a genuine dispute of fact on the issue.

### b) The Schedule Is an Employment Agreement

The schedule lists Defendant's requirements for each of the three tiers of registry nursing positions available at Trinity. [78-1] at 14. Tier II, for which Defendant hired Plaintiff, lists the pay rate as $36.75 per hour and describes the shifts and holidays a Tier II registry nurse must work. *Id.* The bottom of the schedule includes signature lines for an employee and a manager, along with this statement: "I agree with the terms of this *agreement*." *Id.* (emphasis added).

Plaintiff testified that—after she interviewed at Trinity, but before she accepted the job in the ED—the acting ED manager emailed her the schedule. [78-1] at 15. Plaintiff also stated: "that was the offer, and I accepted it." *Id.* While Plaintiff worked as a Tier II registry nurse, Defendant paid her $36.75 per hour, just as specified in the schedule.

Under Illinois law, an employment agreement requires only mutual assent to the terms, rather than the formalities that often accompany a contract. *Hess*, 668 F.3d at 452. And employees and employers can establish the "material terms" of an agreement, including compensation, "by acting in a manner consistent with an employment agreement." *Landers-Scelfo*, 827 N.E.2d at 1059. Here, interpreting the evidence in the light most favorable to Plaintiff, *Anderson*, 477 U.S. at 255, the initial interaction and the parties' conduct over the course of her employment confirm the material terms of their employment agreement. Defendant emailed the schedule to Plaintiff knowing that it contained the word "agreement" with signature

lines, and expecting that it would inform Plaintiff of the conditions of her potential employment. Plaintiff testified that she signed the schedule, and accepted the job (in response to receiving the schedule) with the understanding that the schedule "was the offer." [78-1] at 15. Plaintiff then continued working for Defendant while Defendant continued paying her $36.75 per hour for her recorded hours, exactly as specified in the schedule. Thus, the fact that Plaintiff could not produce a signed copy of the schedule, [77] ¶ 11, does not mean that no agreement existed.

Despite these facts, Defendant argues that Plaintiff's IWPCA claim fails because she has not identified an agreement to pay her for the *particular* work allegedly performed." [87] at 11 (quoting *Cohan v. Medline Indus., Inc.*, 170 F. Supp. 3d 1162, 1176 (N.D. Ill. 2016)). In other words, Defendant argues that it never agreed to pay Plaintiff for *unrecorded* hours.

The cases that Defendant cites in support for this argument, however, are distinguishable. In *Cohan*, for example, the plaintiff salespeople failed to show that their agreement to do "particular work" entitled them to commissions derived from a calculation that excluded accounts with negative sales growth. 170 F. Supp. 3d at 1175. Likewise, in *Brown v. Lululemon Athletica, Inc.*, No. 10-cv-05672, 2011 WL 741254, at *3 (N.D. Ill. Feb. 24, 2011), the plaintiff employee failed to show that an employment agreement entitled her to a certain type of compensation, namely, pay for "ancillary activities" such as "taking one exercise class per week" and "listening to a motivational CD."

Unlike the plaintiffs in those cases, Plaintiff here does not seek compensation for ancillary activities, or a bonus based upon only certain metrics of her job performance. She seeks wages owed for the very work that Defendant hired her to do: nursing. Interpreting the evidence here in the light most favorable to Plaintiff, a reasonable factfinder could conclude that she and Defendant mutually assented to an agreement that Defendant would pay Plaintiff $36.75 per hour for all hours spent on nursing work, regardless of whether those hours were properly recorded. This Court also notes that Plaintiff's missed meal periods technically *were* recorded hours—Defendant subtracted 30-minutes' pay per shift from the total time that Plaintiff remained logged in to AW. By deducting 30-minutes' pay from each of Plaintiff's shifts even though she never got a lunch break, Defendant ostensibly deprived Plaintiff of wages it owed her under that employment agreement.

In light of the above, this Court denies Defendant's summary judgment motion as to Plaintiff's IWPCA claim.

## B.    FLSA Conditional Certification and Rule 23 Class Certification

### 1.    FLSA Conditional Certification

Plaintiff seeks to conditionally certify an FLSA class defined as follows:

> All persons employed by Advocate Health and Hospitals Corporation as hourly paid nurses in Trinity Hospital's Emergency Department and who were paid for working at least 38.5 hours in an individual work week in the last three years.

[73] at 21. Plaintiff seeks conditional certification only on her meal-deduction

20

claims, not her claims for unpaid post-shift work.  *Id.* at 22.  For the reasons explained below, this Court grants Plaintiff's motion for conditional certification.

### a) Applicable Standard

Citing cases mainly from outside this district, Defendant contends that Plaintiff must satisfy a heightened standard for conditional certification because the parties have completed "a significant amount of discovery."  [84] at 14.  This Court disagrees.  Although more stringent review can be appropriate at the initial stage when "substantial discovery has already taken place," *DeMarco v. Nw. Mem'l Healthcare*, No. 10-cv-397, 2011 WL 3510905 (N.D. Ill. Aug. 10, 2011), it is not appropriate here.

This Court finds that the record is "too limited to justify applying the more stringent review."  *Id.* at *2.  Defendant submitted declarations from numerous employees—averring that they knew about the "no lunch" code and never felt pressure from management not to use the code—to contradict Plaintiff's story.  *See* [85] at 2 (Defendant's appendix listing 11 declarations supporting its opposition to Plaintiff's motion).  But Plaintiff has not yet "had a chance to depose or seek written discovery" from those declarants, *DeMarco*, 2011 WL 3510905, at *2, with one exception—Kristin Landini, who is Defendant's Vice President of HR, not a potential class member.  [85-1] at 480.  Besides, the parties agreed to conduct discovery in two stages, and they have not reached the second stage.  [86] at 10; *see also Betancourt v. Maxim Healthcare Servs., Inc.*, No. 10-cv-4763, 2011 WL

1548964, at *13 (N.D. Ill. Apr. 21, 2011) ("Defendant's submission of 23 affidavits of its own employees, none of whom have been deposed by Plaintiff, does not count as discovery for these purposes."). To be sure, Plaintiff will need to meet the more stringent standard before her FLSA collective action proceeds to trial, so Defendant will have another chance to argue that she fails to meet the heightened standard.[2]

### b) Plaintiff Meets the Stage-One Standard

Under the more lenient standard, Plaintiff must make a "modest factual showing" that she and "similarly situated employees" were "victims of a common policy" that violated the FLSA. *Grosscup*, 261 F. Supp. 3d at 870. Plaintiff has made that showing. Although Defendant might have appropriate formal overtime policies on the books, Plaintiff shows that Defendant may not have enforced those policies for ED nurses. Plaintiff and other nurses gave sworn testimony that management never told them how to use the "no-lunch" code, that management knew they did not get lunch breaks, and that management discouraged them from using the "no-lunch" code. [69] at 12–71. While Defendant's declarants swear the opposite, *see* [85-1] at 457–90, 988–99, this Court does not "weigh evidence, determine credibility, or specifically consider opposing evidence" from Defendant at the first stage of conditional certification. *Bergman*, 949 F. Supp. 2d at 855–56.

---

[2] Without expressing any view on the ultimate merits of such arguments, this Court might also address the issues that Defendant raises by later creating subclasses at the second stage. *See, e.g.*, *Betancourt*, 2011 WL 1548964, at *13. District courts can grant conditional certification at stage one even when the defendant provides evidence of significant differences among potential class members. District courts do so "because these differences can be solved at stage two through subclassification" instead of by "stopping a case from proceeding as a collective action prematurely in its infancy." *Id.* at *5, *13.

Plaintiff meets her burden on the common-policy prong.

Arguing an absence of any common policy or plan, Defendant asserts that an automatic-deduction policy, by itself, does not violate the FLSA. [84] at 15–21. Perhaps, but this Court addressed and rejected that assertion, as it relates to *Defendant's* automatic-deduction policy, in the summary judgment section above. At this stage, Plaintiff provides enough evidence to allow a reasonable factfinder to conclude that Defendant's overtime practices violate the FLSA. *See Grosscup*, 261 F. Supp. 3d at 870.

Defendant offers one new argument, however, that this Court did not directly address on summary judgment. Defendant argues that, because the automatic-deduction policy is lawful on its face, Plaintiff must show "a policy-to-violate-the-policy" instead. [84] at 16 (quoting *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 351 (N.D. Ill. 2012)). Semantics aside, that phrase "simply conveys the commonsense notion that an employer with a lawful overtime policy *can* be held liable under FLSA if the plaintiff shows that the employer had a *practice* of violating, disregarding, or failing to enforce that policy." *DeMarco*, 2011 WL 3510905, at *3 (emphasis added). As this Court explained above, Plaintiff makes that showing here.

Second, under the lenient step-one standard, Plaintiff has shown that she and the proposed class members remain similarly situated. *Jirak*, 566 F. Supp. 2d at 848. Plaintiff and the proposed class members all worked (or currently work) as

hourly paid nurses in the same ED. They performed similar duties, reported to the same small group of managers, used the same timekeeping system, and worked under the same automatic-deduction policy. [73] at 8 n.2, n.3; [69] at 12–71. This Court grants Plaintiff's motion to conditionally certify her FLSA class, and she may send her proposed notice [68-1] to potential opt-in plaintiffs.

### 2. IMWL Class Certification

Plaintiff seeks to certify an IMWL class defined as follows:

> All persons employed by Advocate Health and Hospitals Corporation as hourly paid nurses in Trinity Hospital's Emergency Department and who were paid for working at least 38.5 hours in an individual work week since January 26, 2013.

[73] at 21. Plaintiff again seeks to certify only her meal-deduction claims, not her claims for unpaid post-shift work. *Id.* at 22. To obtain class certification under Rule 23(b)(3), Plaintiff must satisfy Rule 23(a)'s four requirements—numerosity, commonality, typicality, and adequacy of representation—and show that: (1) questions common to the proposed class predominate over questions unique to individual members; and (2) a class action is superior to other available options for resolving the controversy. *See Wal-Mart*, 564 U.S. at 345; *Messner*, 669 F.3d at 811. For the reasons explained below, this Court grants Plaintiff's motion to certify a Rule 23(b)(3) IMWL class.

### a) Numerosity

To satisfy Rule 23(a)(1)'s numerosity requirement, Plaintiff must show that

her proposed class has so many members as to make joinder impractical. No magic number exists for numerosity, but a class of 40 satisfies most courts. *See, e.g., Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n.9 (7th Cir. 1969); *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001); *but cf. Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 56 (N.D. Ill. 1996) (certifying a class of 18). Courts may make logical inferences to determine numerosity, so a plaintiff need not prove the exact number of class members. *See Arreola v. Godinez*, 546 F.3d 788, 797 (7th Cir. 2008) (finding numerosity when the plaintiff identified 14 class members and gave evidence supporting "a much larger estimate"). Mere speculation and conclusory allegations, however, cannot establish numerosity. *Id.*

Defendant's records show that it paid overtime to more than 100 ED nurses from January 2013 through 2016. [73] at 23. Plaintiff's proposed class includes nurses who have worked in Trinity's ED since January 2013. This Court can reasonably infer that enough nurses worked in Trinity's ED and earned overtime since January 2013 to make joinder impractical. Plaintiff establishes numerosity.

### b) Commonality

To satisfy Rule 23(a)(2)'s commonality requirement, Plaintiff must show at least one question of law or fact common to the class. *Wal-Mart*, 564 U.S. at 359. Although Rule 23(a)(2) speaks about "questions," class certification really depends upon the capacity of a class proceeding to generate "common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (citation omitted). The "critical point" is

"the need for *conduct* common to members of the class." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (internal quotation marks omitted). When the defendant's allegedly injurious conduct differs from plaintiff to plaintiff, common answers likely do not exist. *Id.*

Here, at the very least, a class action likely will generate common answers to two questions common to the proposed class, driving the resolution of this case:

1. Did Defendant have an unofficial policy of requiring ED nurses to work through meal breaks without pay?

2. If so, does that policy violate the IMWL?

Defendant argues that differences in fact—some nurses worked different shifts, some verified their time cards, some occasionally used the "no lunch" code— preclude certifying Plaintiff's IMWL class. *See, e.g.*, [84] at 21–23. Defendant also rehashes its summary judgment argument that it has lawful overtime policies and that Plaintiff "offers no proof, much less common proof," that Defendant knew that nurses worked during meals without pay. *Id.* at 15–21.

As the Seventh Circuit has explained, the "critical point" in commonality analysis is whether *Defendant's* conduct was common to members of the proposed class. *Suchanek*, 764 F.3d at 756. Here, the commonality analysis does not turn upon whether the proposed class members used identical procedures for verifying timecards or whether they used the "no lunch" code identically. Indeed, Plaintiff does not need to demonstrate commonality as to every issue to achieve class certification. *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 381 (7th Cir. 2015) (The

"question as to whether coffee packaging misled consumers was common despite the fact that individual consumers saw different packaging and may have been harmed to varying extents or not at all."). Plaintiff needs to show that a trier of fact could answer the questions above with common answers across the class, thus driving this case forward. *Wal-Mart*, 564 U.S. at 359.

Here, Plaintiff seeks to certify a specific group of nurses who worked in one department in one hospital. A trier of fact could determine, on a class-wide basis, that ED management—based upon Defendant's common practice—knew that these nurses regularly did not get meal breaks, but discouraged them from using the "no lunch" code and allowed their pay to be docked for meal periods anyway. Defendant again claims that no common answers exist because the declarations it provided contradict the declarations that Plaintiff provided as to whether nurses knew about the "no lunch" code, among other things. *See, e.g.*, [85-1] at 461. But if a trier of fact determines that Defendant had an unlawful policy or practice of making ED nurses work through meal periods without pay, the fact that some nurses knew about the "no lunch" code and others did not would not change the fact of the policy's existence, or its illegality. Plaintiff satisfies the commonality requirement.

### c)  Typicality

To satisfy Rule 23(a)(3)'s typicality requirement, Plaintiff must show enough congruence between her claims and the unnamed class members' claims to warrant allowing her to litigate on behalf of the group. *Spano v. The Boeing Co.,* 633 F.3d

574, 586 (7th Cir. 2011). Generally, a typical claim "arises from the same event or practice or course of conduct that gives rise to the claims of the other class members," and asserts the same legal theory. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (internal quotation marks omitted). Factual distinctions can exist between Plaintiff's claims and other class members' claims, but the claims must share the "same essential characteristics." *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009) (internal quotation marks omitted).

Here, Plaintiff's claims derive from the same course of conduct that affected all members of the proposed class: Defendant's purported practice of making ED nurses work through meal breaks without pay. In this respect, Plaintiff's allegations align with the declarations she provided from 11 other Trinity ED nurses: Defendant knew that each nurse rarely or never got a lunch break because it understaffed the ED, but Defendant continued deducting 30-minutes' pay from each shift that the nurses worked. [69] at 12–71. The proposed class members either never used the "no lunch" code, or used it only occasionally because management allegedly discouraged them from using it. *Id.*

Defendant counters that Plaintiff's motion should be denied given the "substantial variation" among class members; for example, some nurses testified that they "almost always" got meal breaks (notably, these nurses still work for Defendant and Plaintiff has not yet deposed them), and some of Plaintiff's witnesses used a "no lunch" code "from time to time." [84] at 22. But variation on the margins

28

does not eliminate the shared "essential characteristics" of each nurse's claim. *See Muro*, 580 F.3d at 492. Even a nurse who sometimes entered a "no lunch" code could have lost overtime pay if Defendant had an unofficial policy of requiring ED nurses to work through meal breaks without pay. Plaintiff establishes typicality.

### d) Adequacy of Representation

To satisfy Rule 23(a)(4)'s adequacy requirement, Plaintiff must show that she "will fairly and adequately protect" the class's interests. In assessing adequacy, this Court must determine whether Plaintiff has: (1) antagonistic or conflicting claims with other members of the class; (2) a sufficient interest in the outcome of the case to ensure vigorous advocacy; and (3) competent, qualified, and experienced counsel who can vigorously conduct the litigation. *See Streeter v. Sheriff of Cook Cnty.*, 256 F.R.D. 609, 613 (N.D. Ill. 2009).

Aside from a perfunctory statement in a footnote that "Plaintiff fails to meet the commonality, typicality, and adequacy requirements," Defendant does not challenge this element of Rule 23(a). [84] at 26 n.1. Undeveloped arguments are considered waived. *See Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011). From an independent review of the record, this Court also finds that Plaintiff meets her burden on adequacy of representation. In particular, this Court sees no conflict of interest and no reason to doubt that Plaintiff's counsel will be fit to serve as class counsel; they have been deemed adequate class counsel in many prior wage and hour class actions. [73] at 28.

### e) Common Questions Predominate

Rule 23(b)(3)'s predominance requirement tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The predominance requirement, although similar to questions of commonality and typicality, demands more than either of those Rule 23(a) requirements. *Id.* at 623–24. A common question predominates over individual claims if "'a failure of proof on the common question would end the case' and the whole class 'will prevail or fail in unison.'" *Bell*, 800 F.3d at 378 (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013)). If individual issues predominate, on the other hand, class certification should be denied. *Szabo*, 249 F.3d at 675.

Defendant argues that individual issues predominate here for the same reasons that it argued against finding commonality and typicality. Specifically, Defendant argues that damages will be individualized, and some proposed class members will have no overtime claims because they did not exceed the 40-hour threshold in any workweek.

Defendant misunderstands the nature of the proposed class' claim. The proposed claim is that ED nurses have been denied overtime pay because of an unofficial policy that either prevents or discourages them from seeking pay for working through meal periods. If a trier of fact determines that no such policy exists (this Court makes no prediction here on the merits of the issue), then the

claim would fail for the class *as a whole*, leaving only individual claims based upon a different legal theory. *See Bell*, 800 F.3d at 378 (explaining that the remaining individual claim "would be one by individual Employee A alleging that her manager, Manager B, forced her to work off-the-clock without pay").

As for individualized damages, courts frequently bifurcate class proceedings to address liability on a class-wide basis and damages individually. *See Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800–01 (7th Cir. 2013) (recommending bifurcating instead of denying class certification). Even if this Court needs to conduct individual trials on damages, a class proceeding on liability would serve judicial economy by eliminating the need to determine, in each trial, whether the challenged practices were lawful. *Bell*, 800 F.3d at 380. Besides, certified classes almost inevitably include people who were not injured (or who were injured to a different degree) by the defendant's conduct. *Id.* If "'very few members of the class were harmed, that is an argument not for refusing to certify the class but for certifying it and then entering a judgment that would largely exonerate' the defendant." *Id.* (quoting *Suchanek*, 764 F.3d at 757–58).

### f)     A Class Action is Superior to Other Options

To satisfy Rule 23(b)(3)'s superiority requirement, Plaintiff must show that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. A class action is superior when the judicial economy from consolidating separate claims "outweighs any concern with possible

inaccuracies from their being lumped together in a single proceeding." *Mejdrech v. Met-Coil Sys. Corp.,* 319 F.3d 910, 911 (7th Cir. 2003).

The efficiency of a class action derives from having to answer common questions of fact and law just once—a real savings in the context of the factual and legal issues here. At least one other FLSA and IMWL case has been brought against Defendant in this district, *Roberts v. Advocate Health Care*, 119 F. Supp. 3d 852, indicating that combining these claims into a class action could prevent piecemeal overtime claims for other Trinity ED nurses. Aside from an unsupported statement in a footnote, Defendant does not even challenge this element. [84] at 26 n.1. Undeveloped arguments are considered waived. *See Clarett*, 657 F.3d at 674. Plaintiff satisfies the superiority requirement.

In light of the above, Plaintiff thus satisfies all Rule 23(a) and Rule 23(b)(3) requirements for certifying her IMWL class.

### 3. IWPCA Class Certification

Plaintiff seeks to certify an IWPCA class defined as follows:

> All persons employed by Advocate Health and Hospitals Corporation as hourly paid nurses in Trinity Hospital's Emergency Department since January 26, 2006 and who had a thirty minute meal period automatically deducted from their scheduled shift.

[73] at 22. To certify her Rule 23(b)(3) IWPCA class, Plaintiff must satisfy the requirements outlined above for certifying her IMWL class. For the reasons explained below, this Court grants Plaintiff's motion to certify a Rule 23(b)(3)

IWPCA class.

### a)      Numerosity

To satisfy Rule 23(a)(1), Plaintiff must show that her proposed class has so many members as to make joinder impractical. For the same reasons noted above regarding the IMWL class, Plaintiff makes the requisite showing. Defendant's timekeeping records from May 2008 to April 2016 show that more than 200 nurses worked in Trinity's ED over that eight-year period. [73] at 23. Plaintiff's proposed class includes nurses who worked in Trinity's ED since January 2006. Thus, this Court can reasonably infer that Plaintiff's proposed class has so many members as to make joinder impractical. Plaintiff satisfies numerosity.

### b)      Commonality

To satisfy Rule 23(a)(2), Plaintiff must show at least one question of law or fact common to the class. *Wal-Mart*, 564 U.S. at 359. For the same reasons noted above regarding the IMWL class, Plaintiff makes the requisite showing. Here, a class action likely will generate common answers to at least one question common to the proposed class, driving the resolution of this case:

1.      Did Defendant have an unofficial policy of requiring ED nurses to work through meal breaks without pay?

Defendant argues that Plaintiff does not satisfy commonality because she cannot show an agreement to pay any of the nurses for unrecorded hours, let alone an agreement common to all nurses. [84] at 28–29. This Court already rejected Defendant's argument that it did not agree to pay Plaintiff for unrecorded hours.

(This Court notes again that hours the nurses worked during meal periods were recorded; AW automatically deducted pay for 30 minutes each shift after the fact.)

In the same vein, this Court finds that the proposed class members likewise worked under employment agreements in which Defendant agreed to pay them an hourly wage for all hours worked. As noted above, under Illinois law, an employment agreement requires only mutual assent to the terms, *Hess*, 668 F.3d at 452, and employees and employers can establish an agreement's "material terms" by "acting in a manner consistent with an employment agreement," *Landers-Scelfo*, 827 N.E.2d at 1059. Defendant sent each nurse an offer letting stating his or her hourly rate of pay. Defendant then paid the nurses their hourly rates for recorded hours, and the nurses continued to work under those terms, demonstrating mutual assent. [84] at 29. The fact that the hourly rates may have differed, or that some letters included details about tasks the nurse needed to complete before beginning work while others lacked those details, does not preclude commonality. *See Bell*, 800 F.3d at 381.

By focusing upon whether the proposed class members worked under identical employment agreements, Defendant misses the point of commonality. The question is not whether the nurses worked under identical agreements, but whether, given their varying agreements, a common *answer* to the question above would move this case forward. *Wal-Mart*, 564 U.S. at 359. Here, it would. If a trier of fact determines that Defendant had an unofficial policy of requiring ED nurses to

work through meal breaks without pay, then each nurse would have a right to claim earned wages under the IWPCA, regardless of the specific contours of their respective employment agreements. Plaintiff satisfies commonality.

### c) Typicality

To satisfy Rule 23(a)(3), Plaintiff must show enough congruence between her claims and the unnamed class members' claims to warrant allowing her to litigate on behalf of the group. *Spano,* 633 F.3d at 586.

Here, Plaintiff's claims derive from the same course of conduct that affected all members of the proposed class: Defendant's purported practice of making ED nurses work through meal breaks without pay. In this respect, as explained in the section addressing Plaintiff's IMWL class, Plaintiff's allegations align with the declarations she provided from 11 other Trinity ED nurses. [69] at 12–71.

Defendant counters that Plaintiff's motion should be denied given the variation among class members' offer letters described above. But some variation between plaintiffs does not take away the shared "essential characteristics" of each nurse's claim. *See Muro*, 580 F.3d at 492. Every nurse worked at an hourly rate under the same internal policies. Plaintiff satisfies the typicality requirement.

### d) Adequacy of Representation

To satisfy Rule 23(a)(4), Plaintiff must show that she "will fairly and adequately protect" the class' interests. As noted above, in assessing adequacy, this Court must determine whether Plaintiff has: (1) antagonistic or conflicting claims

with other members of the class; (2) a sufficient interest in the outcome of the case to ensure vigorous advocacy; and (3) competent, qualified, and experienced counsel who can vigorously conduct the litigation. *Streeter*, 256 F.R.D. at 613.

Defendant argues that Plaintiff is an inadequate class representative because her employment agreement with Defendant stems from the RN Tiered Registry Requirements schedule, while the offer letters of the proposed class members remain similar to the one that Plaintiff received in 2012. In other words, Plaintiff cannot represent the other nurses because she relies upon a "unique document." [84] at 31. Not so. Plaintiff's claims mirror those of the proposed class members: regardless of the specific details of their individual employment agreements, each nurse seeks earned wages that Defendant allegedly owes because of the automatic-deduction policy. Defendant offers no evidence indicating that Plaintiff lacks a sufficient interest in the outcome of the case to ensure vigorous advocacy, or that Plaintiff's counsel will not be fit to serve as class counsel. Again, they have been deemed adequate class counsel in many wage and hour class actions. [73] at 28. Plaintiff satisfies the adequacy requirement.

### e) Common Questions Predominate

Rule 23(b)(3)'s predominance requirement tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623. Here, Defendant appears to recycle its arguments against commonality and typicality to challenge predominance as well, and Defendant's

arguments about individualized damages ostensibly also apply to the IWPCA claims.

Again, Defendant mischaracterizes the nature of the proposed class' claim. The claim here flows from the allegation that ED nurses have been denied wages owed under employment agreements because of an unofficial policy that requires them to work through meal periods without pay. If a trier of fact determines that no such common policy exists, the claim would fail for the class *as a whole*, leaving only individual claims based upon a different legal theory. *See Bell*, 800 F.3d at 378. Additionally, as described in the IMWL certification section above, courts frequently bifurcate class proceedings to address liability on a class-wide basis and damages individually. *See Butler*, 727 F.3d at 800–01; *Bell*, 800 F.3d at 380.

In short, Plaintiff meets her burden regarding predominance.

### f)  A Class Action is Superior to Other Options

To satisfy Rule 23(b)(3)'s superiority requirement, Plaintiff must show that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. As noted above, a class action is superior when the judicial economy from consolidating separate claims "outweighs any concern with possible inaccuracies from their being lumped together in a single proceeding." *Mejdrech,* 319 F.3d at 911. Here, the efficiency of a class action derives from having to answer common questions of fact and law just once. Defendant does not challenge this element. [84] at 26 n.1. Undeveloped arguments are considered

37

waived.  *See Clarett*, 657 F.3d at 674.  Plaintiff satisfies the superiority requirement.

In light of the above, Plaintiff satisfies all Rule 23(a) and Rule 23(b)(3) requirements for certifying her proposed IWPCA class.

## IV.  Conclusion

This Court partially grants and partially denies Defendant's motion for summary judgment [74].  This Court grants Plaintiff's motion to certify her state-law claims as class actions and conditionally certify her FLSA class [68].

This case is set for a case management conference at 10:15 a.m. on March 6, 2018, in Courtroom 1203.

Dated: February 20, 2018

Entered:

John Robert Blakey
United States District Judge